34 N.J. Super. 583 (1955)
113 A.2d 38
ALFRED J. BOHLINGER, SUPERINTENDENT OF INSURANCE OF THE STATE OF NEW YORK, ETC., PLAINTIFF-APPELLANT, AND CROSS-RESPONDENT,
v.
WARD & COMPANY, A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 28, 1955.
Decided March 24, 1955.
*585 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Irvin Waldman, of the New York bar, argued the cause for plaintiff-appellant and cross-respondent (Messrs. Bilder, Bilder & Kaufman, attorneys; Mr. Walter J. Bilder, of counsel).
Mr. Harold D. Feuerstein argued the cause for defendant-respondent and cross-appellant.
The opinion of the court was delivered by JAYNE, J.A.D.
The Preferred Accident Insurance Company of New York was organized and empowered to issue policies of casualty insurance under the Insurance Law of the State of New York. The company acquired a license to pursue its business in this State, and in furtherance of that undertaking it entered into an "Agency Agreement" on July 1, 1949 by the terms of which the defendant was authorized to receive and accept proposals for insurance on behalf of the company, to collect and give receipts for the premiums and "to retain out of premiums collected, as full compensation on business so placed with the company" the therein specified allowances.
*586 The agreement embraced, inter alia, terms of present pertinency which we quote:
"It is a condition of this Agreement that the Agent shall refund ratably to the Company, on business heretofore or hereafter written, commissions on canceled liability and on reductions in premiums at the same rate at which such commissions were originally retained.
(2) For the convenience of the Agent the Company will send monthly to the Agent a record of the business of the month placed by the Agent with the Company, the premiums on which if collected by the Agent, shall be paid to the Company promptly thereafter.

* * * * * * * *
(5) The Company reserves the right to cancel any policy or other contract of insurance or suretyship by direct notice to the insured or obligee."
On April 20, 1951 the Superintendent of Insurance of the State of New York instituted a proceeding against the company in the Supreme Court, New York County, pursuant to Article XVI of the New York Insurance Law to terminate the company's existence and to appoint the superintendent as its statutory liquidator. An order to show cause containing the conventional restraints was issued, a hearing held, and a formal order granting the relief prayed for in the superintendent's petition was filed on April 30, 1951.
On March 7, 1952 the present action was instituted by the liquidator in the Chancery Division of this court to oblige the defendant to account to him for premiums and all other sums of money remaining due and unpaid to the insolvent company.
The basic issues were succinctly stated in the pretrial order, and it is expeditious to quote them:
"(a) What are the rights and interest of the plaintiff and the defendant under the written agreement annexed to the complaint and marked Exhibit A?
(b) Was there another agreement between the parties made subsequent to July 1st, 1949 and if so, what were its terms and conditions?
(c) Should there be an accounting between the parties?
(d) Is defendant entitled to set off against premiums collected by it a sum of money representing (a) the amount of premiums collected by it and allegedly repaid to assureds by reason of the cancellation and reduction of policies, (b) the amount of premiums collected by the defendant and allegedly paid by it to other insurance *587 companies to obtain insurance policies in replacement of cancelled policies, (c) the amount of premiums allegedly paid by the defendant for and on behalf of assureds on policies thereafter cancelled, and (d) commissions allegedly payable to the defendant on premiums collected by it."
It was disclosed at the trial that the amount of premiums collected by the defendant and in its hands at the time of the order of liquidation on April 30, 1951, after deducting its share of commissions, was $6,112.97. The Chancery Division resolved that the defendant by way of offset was entitled to a net credit of $4,054.60 and judgment was accordingly entered in favor of the plaintiff in the sum of $2,058.37. From that judgment both plaintiff and defendant appeal.
In effect the Chancery Division allowed the defendant a credit not only for the unearned portion of premiums aggregating $1,020.01 which were due various policy holders whose premiums remained with the defendant and had not been remitted to the company, but also awarded the defendant an offset for the unearned portions of premiums in the sum of $3,385.33, the entire premiums of which had not only been received by the defendant but paid to the company prior to the institution of the liquidation proceeding. A deduction from the last-mentioned credit for certain items amounting to $350.74 pertaining to policies canceled after April 30, 1951 was directed, concerning which the defendant complains.
Fundamentally the issues here debated are not in all respects confined to the terms of the written agency agreement of July 1, 1949. Parties to an existing contract may, by mutual consent, modify it. Headley v. Cavileer, 82 N.J.L. 735 (E. & A. 1912); Troth v. Millville Bottle Works. 89 N.J.L. 219 (E. & A. 1916); Ball v. Metal-Wash Machinery Co., Inc., 123 N.J.L. 285 (E. & A. 1939).
It is evident that in the customary accounting procedure there were some methodical departures from the requirements of the agency agreement. Of present interest was the practice of the defendant in accounting and remitting premiums due to the company to deduct from its remittance unearned *588 portions of premiums owing or refunded to policy holders whose policies were canceled either by the company or by the policy holder in the ordinary course of business. Vide, 2 Couch, Cyc. of Ins. Law 1285, § 441.
The reasons of convenience and expedition which would motivate the company in acquiescing in the practice of permitting the defendant in the ordinary course of business to make refunds promptly of unearned premiums directly to the former holders of canceled policies from the company's account are understandable. The reported cases disclose that a like course of accounting procedure is not uncommon in the insurance business.
We concur in the conclusion of the trial court that the contractual relationship between the company and the defendant was that of principal and agent which in the service of the issuance and cancellation of policies, the receipt and collection of premiums, the refunds thereof and the deductions therefrom imposed upon the defendant the obligations of a fiduciary. N.J.S.A. 17:22-6.1; Marchitto v. Central R. Co. of New Jersey, 9 N.J. 456, 466 (1952); 2 Am. Jur., Agency, § 251 et seq.; 16 Appleman, Insurance Law & Practice, 224, § 8786; Mechem, Outlines of Agency (4th ed.), p. 367, § 536.
It is not apparent that the defendant's relationship to the company was that of a typical broker having a dual agency status with respect to the consistent interests of both the insurer and the insured. N.J.S.A. 17:22-6.2; cf. Smith & Wallace Co. v. Prussian National Ins. Co., 68 N.J.L. 674, 678 (E. & A. 1903); Maloney v. Rhode Island Ins. Co., 115 Cal. App.2d 238, 251 P.2d 1027 (Dist. Ct. App. 1953); Bohlinger v. Zanger, 306 N.Y. 228, 117 N.E.2d 338 (Ct. App. 1953).
The collected premiums, we think, became a trust fund in the custody of the defendant to be received, held, and disbursed in a fiduciary capacity. We reject, as did the trial judge, the insistence of the defendant that the relation of the parties was that of debtor and creditor. Robertson v. Malone, 190 F.2d 756, 759 (5 Cir. 1951).
*589 A notable feature of the present case is that the defendant, with apprehensions and ultimate knowledge of the insolvency of its principal, endeavored in the shadow of its normal authority to rescue its own customers from loss without regard for the reasonable preservation of the assets of its principal and the anticipated loss of other policy holders. May a fiduciary pervert its agency to the accomplishment of such a purpose?
We must mention the evidence expositive of the conduct of the defendant. Some weeks, perhaps "toward the end of March (1951)," Mr. and Mrs. Ward, who incidentally are the officers and owners of the capital stock of the defendant agency, from information previously derived from the Journal of Commerce and other sources, became apprehensive of the financial resources of the company and proceeded by telephone communications and other means "to pick up" the policies of the company that had been issued to the customers of the agency.
It was explained to the policy holders that the financial condition of the company seemed to be precarious and that if the company survived the policies would be returned, and if the company became insolvent the defendant would provide the customer with a policy of another carrier with like coverage. Mr. Ward elucidated:
"Q. And you told people to give you the policies and they did and you would hold them? A. I did. I said the best thing was to give the policies in and we would keep them in our office and if the company continued in operation then we would give them back, and if not, that the new company would be the United States Casualty Company.
Q. What you were going to do, if the company continued in business you would keep them in the Preferred, and if not you would put them in another company, in the United States Casualty Company? A. Yes."
The customers naturally responded to the defendant's solicitations and by April 27, 1951 the defendant had harvested between 150 and 160 of the company's policies. Assuredly the customers' policies were not in fact canceled or indeed intended to be deemed canceled upon their surrender to the defendant.
*590 On April 20, 1951 the Supreme Court of New York had ordered "that the Preferred Accident Insurance Company of New York, and all persons, are restrained from the transaction of its business * * *," and on April 21, 1951 at 1:15 P.M. the president of the company dispatched to its field manager at Newark the following telegram:
"Restraining order served this company removes all authority to bind the company on any insurance contracts transact any business whatever and disburse any funds as of the date the order was served April 20, 1951 letter follows."
Mrs. Ward acknowledged that the telegram was shown to her by the field manager, but she was dubious about the precise time.
On April 27, 1951 the judge of the New York Supreme Court announced his determination of the insolvency of the company. Something accelerated the activities of the defendant on that day for that evening Mr. Ward, its president, telephoned an officer of the United States Casualty Company at his residence and discussed with him the issuance of policies of the latter company for those of the customers of the defendant agency. This performance has more than the shade of a common business transaction.
But more, April 28, 1951 was a Saturday, during which the Newark office of the Preferred was customarily closed. Fortuitously someone was there on April 28, 1951 to whom the defendant surrendered the 150 or 160 policies. Mrs. Ward explained: "This was a different case. This was a Preferred Accident in trouble."
The evidence in the present case generates most persuasively the conviction that the extraordinary profusion of policy cancellations did not occur in the regular course of business but was in fact induced by the activities of the defendant whose regard for the interests of its own customers perhaps quite naturally transcended the recognition of its obligations to the expiring company.
It cannot be rationally resolved that the acquiescence of the company in the stated accounting procedure impliedly *591 conferred upon the defendant the authority actively to solicit, stimulate, and induce the cancellation of the company's existing policies. Such a bestowal of authority by an insurance company upon a local agent would be unimaginative.
Frankly stated, the company's own agent sought through its own efforts to achieve the preservation of the good will of its own business by circuitously conferring upon its own customers a preference over other innocent policy holders. No principle of law is more firmly established than that which forbids an agent to take an unfair personal advantage of the opportunities of his position in the use of things entrusted to him in the capacity of a fiduciary.
Certain it is that the defendant itself was never legally obligated by the agency agreement or by the implied privilege to refund the unearned premium on a canceled policy on the demand or at the suit of the policy holder. That was the obligation of the company, and not of its agent. Hedwall Co. v. Security Mortgage Co., 156 Minn. 289, 194 N.W. 757, 758 (Sup. Ct. 1923).
Where a premium due to an insurance company is paid by a policy holder to an authorized agent of the company, the payment is deemed in the law to have been made to the company whether the agent remits it to the company or not. Assuredly the mere fact that the company entrusts the agent with funds from which the agent is privileged to refund the unearned premium to the policy holder does not absolve the company from liability to the policy holder. Payment by the company to its agent does not constitute payment to the policy holder. When, then, and in what manner did the defendant acquire a debt of its own which it could offset against its indebtedness to the company?
The policies of the defendant's customers, like all other outstanding policies issued by the company, were in reality cancelled only because of the company's insolvency. The 150 or 160 policies in the defendant's possession were not canceled until it became undeniably evident that the company was insolvent.
*592 At that point, if not before, the defendant abandoned in these transactions its service as an agent of the company and entered upon the performance of an incompatible service for the policy holders.
It is observed that the defendant has filed claims with the liquidator of the company for the unearned premiums as assignee of the policy holders whose policies it had gathered.
If the premiums are in the possession of the insurance company when it becomes insolvent, the insured has only a claim for the unearned sums equal to that of other creditors in the same class in the general liquidation proceedings. See, Bank of United States v. Braveman, 259 N.Y. 65, 181 N.E. 50, 82 A.L.R. 658 (Ct. App. 1932); Pink v. Title Guarantee & Trust Co., 274 N.Y. 167, 8 N.E.2d 321 (Ct. App. 1937); 54 Columbia L. Rev. 638, 640. The pursuit of these claims by the defendant as assignee of the holders of the particular canceled policies occupying in reality the position of general creditors, would be in harmony with the principles of fairness and equity.
It is familiar law that a fiduciary cannot assert as an offset a personal claim against a beneficiary who seeks payment from the fiduciary of funds held for the beneficiary, nor may a trustee withhold trust funds from a cestui to obtain payment of a personal debt. Goodwillie v. City of Bayonne, 2 N.J. 88, 92 (1949); Downey v. Humphreys, 102 Cal. App.2d 323, 227 P.2d 484 (Dist. Ct. App. 1951).
Whatever recognized accounting privilege the company had previously bestowed upon the defendant to refund unearned premiums on canceled policies was, we think, only to be exercised by the defendant in the usual and ordinary course of business. Assuredly the round-up of the herd of 150 or more policies for extinction was neither in the ordinary course of business nor consonant with the duty of allegiance owed by a fiduciary to its principal.
We therefore conclude that in the circumstances of the present case the adjudication that the defendant possessed the authority to act as it did and thus became entitled to *593 set off the unearned premiums in diminution of its indebtedness to the plaintiff is reversed. This holding is in accord with the decision in Bohlinger v. Mayville Realty Co., 135 N.Y.S.2d 865 (Sup. Ct. 1954). It is accordingly resolved that the exclusion by the trial judge of the credits amounting to $350.74 which are implicated in the cross-appeal was proper.
Reversed and remanded for further proceedings in conformity with this opinion.