Richard G. **HERSHEY**, as Director of the Department of Insurance of the State of Illinois, and Liquidator of Central Casualty Company, an Illinois corporation, Plaintiff,

v.

**KENNEDY & ELY INSURANCE, INC.,** a Florida corporation, Defendant.

No. 364–62–M.

United States District Court
S. D. Florida,
Miami Division.

Aug. 16, 1967.

James A. Dixon, Dixon, DeJarnette, Bradford, Williams, McKay & Kimbrell, Miami, Fla., for plaintiff.

Herbert A. Warren, Jr., Carr & Warren, Miami, Fla., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE C. YOUNG, District Judge.

This cause came before this Court for trial on a suit by Richard G. Hershey as Director of the Department of Insurance of the State of Illinois and liquidator of Central Casualty Company, an Illinois corporation, pursuant to the provisions of Chapter 73, Paragraphs 799 to 833, Illinois Revised Statutes (1961), against the defendant, Kennedy and Ely Insurance, Inc., a Florida corporation. Plaintiff seeks recovery of the amount of insurance premiums allegedly due the plaintiff on policies written by the defendant acting as an agent of the plaintiff. Plaintiff originally sued on a trust fund theory, and under said theory claimed the right to both earned and unearned premiums, including premiums on policies that had been written by the agent on credit regardless of whether the agent had actually collected the premiums or not.

Defendant asserted as an affirmative defense an alleged oral contract with the officers of Central Casualty Company which allowed the agent credit for all policies cancelled and provided that the agent was to refund the amount of the unearned premium on the cancelled policy to the insured. Plaintiff then contended that the cancellations beginning on about December 12, 1961, were "mass cancellations" which are not permitted under Florida law, and that, therefore, the plaintiff was entitled to the full premiums on all "mass cancelled" policies. In addition, plaintiff claimed the right to the full amount of all unearned commissions on policies cancelled on or after that date.

During the course of the trial plaintiff orally moved to amend paragraph 7 of the Complaint to conform to the proof which revealed that a large number of the policies allegedly mass cancelled had been written by the agent on credit, apparently without the knowledge or actual consent of the plaintiff company. The trust fund theory upon which the suit was

originally brought could apply only to funds that were actually in the hands of the agent and would not apply to policies written on credit and upon which the premiums had not yet been collected by the agent. The motion was granted and plaintiff was permitted to amend its theory for recovery by asserting that the premiums actually collected by the agency were held in trust and that the uncollected premiums for policies on which the agency had extended credit were owed to the plaintiff by the defendant on the basis of a debtor-creditor relationship (Tr. 65, 66).

The defendant's counterclaim and amended counterclaim for monies allegedly paid out by the agent on cancelled policies had been dismissed by the Court prior to the trial.

On July 1, 1961, Central Casualty Company, plaintiff herein, and Kennedy Ely Insurance, Inc., defendant herein, entered into an agency agreement (Plaintiff's Exhibit No. 1). The agreement provides in paragraph 6 that:

"The agent shall collect all premiums on policies and binders issued by it. Such premiums shall be held and handled as trust funds belonging to the company."

The agreement does not specifically allow the agent to write policies on credit, but does require a method of accounting whereby the agent must, within twenty days after the end of each month, report all business transacted on behalf of the company during said month. In addition, the agent is required to remit the balance shown due the company not later than the 60th day following the month accounted for. The agreement specifically allows the agent to deduct from premiums payable to the company the net commissions due the agent.

Pursuant to this agreement the defendant wrote numerous policies beginning on July 19, 1961, and continuing until December 31, 1961 (Plaintiff's Exhibit No. 7). On January 8, 1962, Central Casualty Company notified the agent by letter that by virtue of a manage-

ment decision Central Casualty Company had elected to "momentarily" withdraw from the writing of workmen's compensation and employer's liability insurance, and that pursuant to this decision all workmen's compensation policies would be cancelled (Defendant's Exhibit No. 5). Subsequently, on January 20, 1962, the defendant received a telegram from the plaintiff stating that "Central Casualty Company cannot accept any new or renewal business effective on or after January 1, 1962. All such items received on or after January 1, 1962, will be returned." (Defendant's Exhibit No. 6). On February 1, 1962, the Circuit Court of Cook County, Illinois, issued a temporary injunction enjoining the transaction of any company business, or disposition of any assets or property of Central Casualty Company by its officers, agents, directors, employees and all other persons. (Plaintiff's Exhibit No. 15). The defendant admittedly received a copy of said injunction order subsequent to that date. On March 1, 1962, the Circuit Court of Cook County entered an Order of Liquidation against the Central Casualty Company (Plaintiff's Exhibit No. 3), which order had the effect of cancelling all outstanding policies of Central Casualty Company as of that date. The defendant received a copy of said order on March 15, 1962.

In the month of December, 1961, Central Casualty Company was under examination by the Superintendent of Insurance of the State of Illinois (Tr. 97). The State Insurance Examiners were in the home office of the Central Casualty Company during that month. At that time there were articles in the trade journals mentioning the fact that Central Casualty Company was under examination (Tr. 98).

During the months of July through December 1961, the defendant was allowed credits and returned premiums for numerous policies that were cancelled during that period of time. These cancellations were apparently done during the normal course of business. However, during the latter part of December

1961, and the early part of January 1962, the number of cancellations increased sharply. In fact, every transaction after January 1, 1962, reflected a credit or a returned premium (Plaintiff's Exhibit No. 7). The last transaction with a net premium to the company was on December 30, 1961, on Policy No. 50161 (Plaintiff's Exhibit No. 7, page 10). By way of contrast, as to premiums actually collected, the amount of refunds and cancellations from July 24, 1961 until December 31, 1961, totaled only $931.79 (Plaintiff's Exhibit No. 8), whereas, the amount of refunds and cancellations for the period of January 21 to January 31, 1962, totaled $10,336.74 (Plaintiff's Exhibit No. 9). The largest number of cancellations occurred during the month of January 1962, and cancellations continued thereafter through March 15, 1962.

On the basis of the above undisputed facts and after reviewing and considering the pleadings, arguments of counsel, memoranda of law filed by counsel, and the law applicable to this case, the Court makes the following:

## FINDINGS OF FACT

██ 1. The cancellation of insurance policies commencing on the 1st day of January, 1962, was a mass cancellation and was not done in the ordinary course of business. Such cancellations began at that time because of the knowledge of the impending insolvency of Central Casualty Company and were done for the specific purpose of protecting the agent and its customers against the consequences of such insolvency. While there was no direct testimony or evidence to that effect, this is a logical inference to be drawn from the evidence showing the marked increase in cancellations in late December 1961, and early January 1962, and continuing thereafter, and from the reports of the investigations of the financial condition of the company as reported in insurance trade journals during the month of December 1961.

2. Many of the policies which were cancelled on or after January 1, 1962, had been written by the agent on credit and many of the premiums on such policies had either not been collected or had been collected only in part by the agent at the time of cancellation. (Tr. 18–20, 76)

## CONCLUSIONS OF LAW

██ 1. This Court finds that the mass cancellation of policies subsequent to December 31, 1961, is not authorized under Florida law. With respect to premiums actually collected such mass cancellation places the policyholders in a preferred position over other creditors of the insurance company. Premiums actually collected by the agent are held by the agent in a fiduciary capacity as trust funds both under Florida law, Robertson v. Malone, 190 F.2d 756, 759 (5th Cir. 1951), and by the terms of the agency agreement itself (Plaintiff's Exhibit No. 1, paragraph 6). As stated in Virgin Insurance Agency v. Alabama General Insurance Company, 114 So.2d 524 at 525 (1 D.C.A. Fla.1959):

"There is no showing of right or obligation on the part of the agents to procure insurance with another and solvent company for the benefit of those whose policies with the insolvent insurer were cancelled. To permit the agents of the insolvent company to utilize funds remitted for payment of premiums of insurance and remaining in their hands at the time of adjudication of insolvency for the purchase on behalf of the insured of other insurance in a solvent company would in effect place such policyholders in a preferred position and would work a penalty against those policyholders and creditors whose premiums were remitted to the insurer prior to insolvency. It is a paramount principle of law that an agent is forbidden to take an unfair personal advantage of the opportunities of his position in the use of things entrusted to him in the capacity of a fiduciary." See Clay v. Independence Mutual Company, 359 S.W.2d 679, at 684 (Mo.Sup.Ct.1962).

"Defendants commendably sought to protect the innocent buyers, but defendants were not free to use another's

assets to make the policyholders whole. By the terms of the contract, the premiums belonged to (the insurance company)." Arnold v. Wheeler, 304 S.W.2d 368, 370 (Tex.Civ.App.1957).

"It neither appears nor is it argued that defendant's conduct was infected with the taint of moral fraud, but plainly what was attempted here cannot be brought within the authority of a practice developed to facilitate the settling of accounts in the routine of the operation of a going business." Bohlinger v. Ward and Co., 20 N.J. 331, 120 A.2d 1, 4 (1956).

■ Neither the contract nor the course of dealings between the agent and company show any intent to establish a debtor creditor relationship as to funds actually collected by the agent. See Twin City Fire Ins. Co. v. Green, 176 F.2d 532, 535 (8th Cir. 1949).

■ As for the policyholders who have paid the full premium, upon the insolvency of the company they became creditors entitled to share pro rata in the assets of the company to the extent of the unearned premiums. North River Ins. Co. v. Walker, 65 F.2d 116 (8th Cir. 1933).

■ Where the agent itself has voluntarily paid the unearned portions of premiums to the policyholders as it has apparently done here, or has in effect done so by reinsuring the policyholders with other companies, the agent stands in the shoes of the policyholder as an assignee of the policyholder's claim against the liquidator for the unearned portion of the premiums on the lawful date of cancellation of the policies (herein, March 1, 1962). The right of the agent is the same as that of the policyholder as a creditor with a general claim against the liquidator. The agent, of course, has no right or claim for any portion refunded for the period prior to March 1, 1962.

■■ 2. In addition to liability on a trust fund theory for premiums collected on policies which were mass cancelled, the agent is also liable for the amount of uncollected premiums earned as of March 1, 1962, or which would have been earned on that date except for the mass cancellation, irrespective of whether or not the agent will be able to collect such premiums. Where partial credit has been extended the agent is liable for the full amount collected (trust fund theory) and for the earned portion (to March 1, 1962) of the uncollected amount of the premium, also based on the March 1, 1962 liquidation date. As to such uncollected premiums there exists the relationship of debtor and creditor between the agent and the insurer. This is evidenced by the agency agreement which required a remittance to the company within sixty (60) days of the end of each month of the entire balance due and owing on business conducted by the agent on behalf of the company during that month. This method of payment is commonly known in the insurance industry as an "account current."

"An account current is a statement by the agent in which he includes all policies written during that month and all return premiums on policies canceled during that month, and brings down his net premiums less his commission and whatever other charges or balances are due the company for the transactions during that month, regardless of whether or not the premiums were paid or collected." Continental Casualty Co. v. Easley, 290 S.W. 251 at 253 (Tex.Civ.App.1926). And see Bohlinger v. Kagan, 147 F. Supp. 910 (D. Rhode Island 1956).

■ Under such agreement any policies written by the agent upon credit were written at the agent's own risk as to whether or not the agent could or could not collect such premiums. Any extension of credit by the agent without the express authority by the company where the agency agreement requires an accounting, as it does here, is done at the risk of the agent. The agent's liability is not that of a guarantor but is an original undertaking. As stated in Alliance

Insurance Company v. City Realty Company, 52 F.2d 271 at 275 (M.D.Ga.1931):

"The agent cannot thus extend the company's risk without authority from the company and, in consideration for such authority, the agent agrees, for his own benefit, to become liable to the company for its part of the premium whether collected or not. That liability is a debtor and creditor liability, but it is an additional liability to that of the insured, growing out of a separate, original undertaking on the part of the agent for a consideration, and has no effect upon the contract between the company and the insured except to prevent its termination. In extending further credit the agent acts for the company and by the company's authority. He extends the life of the contract and thus continues the company's liability to the insured on the policy and continues the liability of the insured to the company for the premium. It is the company's credit and the company's risk which are extended, and after such extension the company has the promise of the insured to pay the premium and also the promise of the agent to pay the premium less his commission. The company then depends upon the agent as agent to collect the money from the insured and remit the 'balance' within the sixty-day period or, if he fails to collect as agent, then, as independent promissor, to remit the 'balance' in discharge of his separate, original undertaking."

■ The mass cancellation of policies on which the premiums had not been collected, either in whole or in part, also would result in an unlawful preference to such policyholders as to the portion of the premiums that would have been earned up to March 1, 1962, since the liquidator would have had a cause of action against the policyholders for that amount instead of just the amount earned prior to the cancellation by the defendant. Therefore, under the reasoning of the *Virgin Insurance Agency, Inc.* case, supra, the cancellation of these policies—even where none of the premiums had been or could be collected by the agent—was also impermissible under Florida law.

The fact that the agent was normally allowed credit for cancellations and for the return of unearned premiums to policyholders applied only to transactions done during the normal course of business and is inapplicable to a situation involving a mass cancellation.

However, as to the uncollected premiums or uncollected portion of premiums, the agent is liable only to the extent that such premiums would have been earned on the March 1, 1962 liquidation date. Had this not been a mass cancellation by the agent, all the policies would have been cancelled as of March 1, 1962, and the agent would not have been liable for the portion of uncollected premiums beyond that date. This differs from the holding with respect to collected premiums in that no unlawful preference to policyholders is involved here beyond the date of the March 1, 1962 cancellation since policyholders who had not paid the unearned premiums on policies cancelled by the insolvency cannot be held liable therefore. Bohlinger v. Ward and Co., 20 N.J. 331, 120 A.2d 1, 4 (1956).

■ 3. The plaintiff in this case further seeks to hold the agent liable for the unearned commissions on all policies which were mass cancelled by the agent. As to premiums actually collected, the agent is liable for the amount of his commission unearned as of the date of the Order of liquidation (March 1, 1962). By the terms of the agency agreement the agent was permitted to deduct from all premiums collected the full amount of the agent's commission. The monthly accounting required by the agency agreement also specifically provided for the deduction of the premium by the agent (Plaintiff's Exhibit No. 1). However, upon cancellation of a policy the agency agreement further required in paragraph 5 thereof that the "agent shall refund to the company a pro rata portion of commissions on return premiums, resulting from cancellations * * * at the same

rate at which the commissions were credited to the agent on the policies to which such return premiums apply." Thus, had there been no unlawful mass cancellation, the agent would have been entitled to retain his share of the commission which had been earned on the date the policies were or would have been cancelled by the March 1, 1962 Order of liquidation, but would be liable to the company for the retained portion of the commission which had not been earned on that date.

"The * * * question is whether the receiver is entitled to recover from (the agent) *commissions* on premiums unearned because of the * * * court order cancelling all (company) policies. By a plain and unambiguous provision of the agency agreement it was the obligation of (the agent) to ratably refund commissions on cancelled policies. When the receiver was appointed and all policies of (the company) were cancelled by the Circuit Court * * * (the agent) was duty bound under its contract to ratably refund to the receiver the commissions it had retained on all policies of (the company) it had written but for which it had not previously accounted to (the company)." Clay v. Independence Mutual Insurance Co., 359 S.W. 2d 679, 684 (Mo.Sup.Ct.1962).

4. With respect to the uncollected premiums, the agent has no liability beyond March 1, 1962, either for unearned premiums or for unearned commissions. The agent is, however, entitled to deduct from the uncollected or partially uncollected premiums for which he has been held liable, the earned portion of his commission based on the March 1, 1962 cancellation date, for the same reasons as he is allowed a deduction on collected premiums.

5. The Court further finds that the existence or non-existence of the alleged oral contract of July 17, 1961, modifying the written agency agreement of July 1, 1961, is immaterial to the result in this case because of the finding of a mass cancellation on the part of the agent. As-

suming, without finding, that such oral contract existed, it would not entitle the defendant to a credit for policies illegally cancelled; the oral contract allowing a credit for cancellations and for refunds of unearned premiums would apply only to cancellations done in the normal course of business and would be inapplicable to the mass cancellation involved herein. In the case of Arnold v. Wheeler, 304 S.W.2d 368 (Tex.Civ.App.1957), where the jury found that in addition to the written agency agreement there was an oral agreement between the company and the agent as to cancellation of policies and as to the return and credit for premiums, the Court stated that the "agreement, if it existed, was not an agreement to cancel all policies." The Court there held that the agreement was not an authorization for credit in regard to a mass cancellation.

On the basis of the above Findings of Fact and Conclusions of Law, this Court holds that the defendant is liable to the plaintiff for the total amount of all premiums collected by the agent on policies in force and effect on December 31, 1961. As to the policies in force and effect on December 31, 1961, but as to which the premiums had not or have not been collected by the agent, the defendant is liable for the amount of uncollected premiums on such policies up to and including March 1, 1962, the date of the Order of liquidation, and for the entire amount actually collected subsequent to that date and in the agent's hands on March 1, 1962.

As to both collected and uncollected premiums and portions of premiums, the defendant is entitled to deduct his share of the earned commissions based on a cancellation date of March 1, 1962.

The exhibits and records of testimony before the Court do not contain a separate enumeration based on the accounts showing separately the amounts of the premiums collected prior to March 1, 1962, and those uncollected on March 1, 1962, or a calculation as to what portions of the commissions were earned or would

have been earned by March 1, 1962, had there not been a mass cancellation.

A determination of the above amounts, which is necessary to enable this Court to frame a proper judgment, will require a separate accounting with regard to each individual policy. The plaintiff is, therefore, directed to submit to this Court a full and complete accounting in accordance with the above Findings of Fact and Conclusions of Law. Such accounting shall show:

(1) The full amount of unremitted premiums collected by the defendant with respect to all policies written prior to March 1, 1962, and in full force and effect on December 31, 1961, less a deduction for the portion of the commissions earned or that would have been earned on March 1, 1962; and

(2) The total amount of uncollected premiums on policies in effect on and after December 31, 1961, regardless of whether or not such policies were cancelled, to the extent that such premiums were earned or would have been earned on March 1, 1962, and deducting therefrom only the portion of the commission earned prior to March 1, 1962.

## SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

This Court has heretofore filed its Findings of Fact and Conclusions of Law, in which the plaintiff was directed to file an accounting on the basis stated therein. Such an accounting has been filed, the defendant has filed a counter-accounting, and the plaintiff has filed an amended accounting.

Thereafter, a further hearing was held, at which the Court heard the testimony of the witness for the plaintiff and the witness for the defendant who had prepared the respective accountings. These accountings were admitted into evidence without objection.

From these and from statements of counsel for the defendant it appears, and I so find, that the defendant admits that it is indebted to the plaintiff in the amount of $6,694.13.

From the accountings submitted by the plaintiff and from the testimony of the plaintiff's witness, it appears, and I so find, that there is due to plaintiff from the defendant the further sum of $2,322.-44. This represents policy premiums paid in full by the defendant to CENTRAL CASUALTY COMPANY, but which the defendant now claims in its accounting were only partially paid.

From the accounting submitted by the plaintiff and from the testimony of the plaintiff's witness, it appears, and I so find, that there is due and owing to the plaintiff from the defendant the further sum of $249.23. This represents the net total of a number of small adjustments in plaintiff's premium computations.

### CONCLUSIONS OF LAW

The defendant is justly indebted to the plaintiff in the sum of the foregoing items, to-wit:

$6,694.13
2,322.44
249.23
―――――――
$9,265.80

together with interest on said sum at 6% per annum from the date of the institution of this suit, to-wit, July 13, 1962, until paid.

Let judgment be entered accordingly.