FILED
COURT OF APPEALS
DIVISION II

2014 JUL 22 AM 10: 21

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MIKE KREIDLER, INSURANCE COMMISSIONER, as Receiver for Cascade National Insurance Company, | No. 44745-2-II |
| Respondent, | |
| v. | |
| CASCADE NATIONAL INSURANCE COMPANY, | PART PUBLISHED OPINION |
| Defendant, | |
| STATEWIDE GENERAL INSURANCE AGENCY, INC., and MARCEL MATAR, | |
| Appellants. | |

JOHANSON, C.J. — Statewide General Insurance Agency, Inc. (Statewide) and its chief executive officer (CEO), Marcel Matar, appeal from the entry of summary judgment in favor of Insurance Commissioner Mike Kreidler (Commissioner) as receiver for Cascade National Insurance Company (Cascade). In the published portion of this opinion we address Statewide and Matar's argument that the amount due to the Commissioner was overstated because the Commissioner failed to credit Statewide for certain set-offs and relied on a contractual formula that was imposed without Statewide's knowledge, as well as their argument that the

Commissioner's expert witness lacked foundation.[1]  Because Statewide and Matar's claims are without merit, we affirm the trial court's grant of summary judgment.

## FACTS

### I. CASCADE AND STATEWIDE

Cascade was a Washington insurance company.  In 1999, Cascade designated a California insurance company, Statewide, to act as its general agent for the purpose of issuing Cascade auto insurance policies in California.  The arrangement was established in three fully integrated "General Agency Agreement[s]" executed in February 1999, January 2004, and May 2004, respectively.[2]

Under Cascade and Statewide's agreement, Statewide would collect premiums on the Cascade insurance policies it sold, deduct a provisional commission for itself, and then deposit the balance into a premium trust account.  Statewide would report its estimates of premiums collected, fees earned, and commissions due to Cascade.  Then, every year Cascade would determine the actual commissions due to Statewide based on the ratio of premiums earned to losses and loss adjustments (loss ratio).  The difference between the preliminary commissions and the actual commissions would be paid within 45 days of demand and any deficits or surpluses would not be carried over to the next year.

From the beginning of their business relationship, Statewide held all premiums in a fiduciary capacity on behalf of Cascade.  Clerk's Papers (CP) at 79, 395 ("[I]t shall be

---

[1] In the unpublished portion of this opinion we address and reject the argument that Matar should not be held personally liable because his personal guarantee of payment lacked consideration or was obtained by fraud.

[2] The substance of these written instruments is largely the same and we discuss the differences only where they are relevant.

conclusively presumed that [Statewide] is a fiduciary of [Cascade] with respect to trust funds."); CP at 475 ("All premiums are the property of [Cascade] and shall be held by [Statewide], in a separate account, and in a fiduciary capacity as trustee for [Cascade].").  Furthermore, certain employees of Statewide were required to personally guarantee payment under the agreement.[3] Statewide's CEO Matar signed a personal guarantee in 1999 and again in May 2004.  Finally, Statewide expressly waived any "counterclaim, cross-claim, or set-off" in any action by Cascade to recover trust funds.  CP at 79, 395.

Cascade and Statewide had a turbulent relationship, marked (in Statewide's view) by alleged malfeasance.  In 2003, Cascade and Statewide had a dispute over $230,000 in unpaid commissions that Cascade alleged Statewide owed.  Cascade threatened to prohibit Statewide from selling Cascade insurance if Statewide failed to repay the $230,000.  Accordingly, in December 2003, Cascade and Statewide entered into a settlement agreement that stipulated that Statewide owed Cascade $230,000 in unpaid earned premiums through 2003, and provided for Statewide to pay the $230,000 on an installment basis out of commissions earned.  The settlement agreement also disclaimed any "further financial claims regarding premium accounting against Statewide General Insurance Agency, Inc. for the period of Feb 1, 1999 to December 31, 2003."  CP at 514 (capitalization omitted).  Indeed, the record shows that at the same time the settlement agreement was signed, Cascade forgave $339,659.35 of Statewide's debt.

---

[3] *See* CP at 396, 533 ("[Statewide] shall cause any of its employees or other representatives who are signatories on, or who otherwise control, [Statewide's] account(s) containing trust funds to execute and deliver to [Cascade] a guarantee of payment of the trust funds."); CP at 488 ("If [Statewide] is a corporation or a limited liability company, the shareholder(s) or member(s), as the case may be, signing below agree to guarantee the payment of all sums due [Cascade] under this Agreement and any successors hereto.").

In January 2004, Cascade withdrew $272,763.20 from the premium trust account, but it did not credit the money against Statewide's promissory note. Rather, Cascade continued to take installment payments on the note by reducing its commission payments to Statewide. In November 2004, Cascade withdrew $205,893.38 from a different premium trust account, but it did not credit the money against Statewide's account balance.

Statewide further alleges that Cascade altered the loss ratio mechanics of their agreement without Statewide's knowledge. In February 2004, Cascade sent Statewide replacement pages for their then-existing written agreement that purported to correct errors. In reality, the new language decreased the loss ratio bonus and increased the loss ratio penalty on Statewide's commissions. Not realizing that the replacement pages would change the nature of the agreement, Matar signed off on the change. The parties reexecuted the amended contract in May 2004.

Between January 2004 and March 2005, Statewide complied in full with its contract with Cascade. Statewide reported $3.9 million in premiums, and after deducting its commission, paid Cascade $3.2 million through the premium trust account. In April 2005, one month before the Commissioner took receivership of Cascade, Statewide's stance changed. Between April and December 2005, Statewide reported $1.3 million in gross premiums, but it only paid Cascade $90,000. Statewide admits that it withheld more commissions than was otherwise owed, but it asserts that it did so in order to "balance the ledgers." Br. of Appellant at 17.

## II. CASCADE RECEIVERSHIP

In May 2005, the Commissioner took receivership of Cascade and commenced rehabilitation proceedings. Under the receivership order, the Commissioner took possession of all of Cascade's assets, contracts, and rights of action. The order also required anyone in

4

possession of assets belonging to Cascade to deliver and surrender those assets to the Commissioner. The order further conditioned any offsets of assets, records, funds, or deposits of or belonging to Cascade on the express approval of the Commissioner. In addition, the order enjoined any actions or claims against Cascade outside of the statutory receivership process. Finally, the order authorized the Commissioner to pursue all claims against third parties on Cascade's behalf.

Later that year, the Commissioner filed an order of liquidation, which the superior court approved in November 2005. Statewide timely filed with the Commissioner six proofs of claim based on Cascade's alleged breach of the May 2004 agreement. The Commissioner denied all six claims. The superior court approved the denial and Statewide did not appeal.

### III. PROCEDURAL HISTORY

In 2007, the Commissioner filed a claim against Statewide and Matar to recover $941,879 in improperly withheld premiums.[4] The Commissioner moved for summary judgment in 2012.

The Commissioner presented expert accountant Barbara Huang's testimony. Huang declared that she arrived at the $941,879 figure by subtracting $131,533.13 of permitted deductions from the $1,073,411.68 that Statewide had collected from policyholders between April and December 2005, according to its own production reports. Statewide and Matar presented their own expert, Jennifer Sims's, testimony. Sims admitted that she "did not have access to complete financial data." CP at 446. Nevertheless, Sims testified that Huang's analysis was unreliable because (1) she had not taken into consideration Cascade's 2004

---

[4] The Commissioner also requested $27,037.25 in past due payments under the 2003 settlement agreement, but he later dismissed this claim.

withdrawal of $205,893.38 from the trust account, (2) Statewide did not actually owe Cascade the $230,000 it promised to repay in the 2003 settlement agreement, (3) Cascade's receivable analysis improperly allocated a negative commission to Statewide, and (4) that the new loss ratio provision was flawed. Sims declared that Statewide may at the most owe Cascade $44,580.55.

The superior court granted summary judgment to the Commissioner on the basis that the amounts allegedly owed to Statewide could not be set off under either Statewide's contract or receivership law. Statewide and Matar timely appealed.

ANALYSIS

Statewide and Matar do not assert that the Commissioner's claim for $941,879 was the result of mathematical error. Rather, Statewide and Matar assert four reasons the $941,879 figure is unreliable: (1) the settlement agreement from December 2003, by which Statewide agreed to pay $230,000, was unenforceable; (2) Cascade withdrew $272,763.20 from the trust account without crediting Statewide's balance; (3) Cascade withdrew $205,893.38 from the trust account without crediting Statewide's balance; and (4) Cascade changed the loss ratio formula in May 2004 without consideration. In Statewide and Matar's view, if we apply the proper loss ratio and we offset the aforementioned amounts against the premiums that Statewide withheld from Cascade, "[t]he balance of the mutual debts and credits between Statewide and Cascade is no more than $44,580.55." Br. of Appellant at 25 (citing CP at 444-55). Furthermore, Statewide and Matar argue that the Commissioner's calculations are unreliable because his expert, Huang, lacked personal knowledge of the accounting prior to 2004.

The Commissioner argues that the credits and debts described above are irrelevant because they could not be set off against the amount Statewide withheld between April and December of 2005. The Commissioner further argues that the change to the contractual loss

ratio is irrelevant because Statewide and Matar do not show how the new language affected the amount due, and Huang's testimony was supported by Statewide's own reporting. The Commissioner is correct—Statewide was the fiduciary of Cascade with respect to all premium receipts, under both statute and the terms of the agency agreement. Statewide could not set off alleged debts and credits against the funds it held as a fiduciary. As such, Statewide could not deduct the $230,000, the $272,763.20, or the $205,893.38 from the amount it owed to Cascade, and knowledge of prior debts and credits was not required to qualify Huang as an expert. Finally, Statewide and Matar failed to plead the loss ratio as a material issue.

I. BACKGROUND: RECEIVERSHIPS AND SET-OFFS

Before applying the specific controlling legal principles to the facts of this case, we provide a brief background on insurance regulation. When an insurance company becomes insolvent or certain statutory conditions are met,[5] the Commissioner may take receivership of the company. RCW 48.99.020(1). The comprehensive statutory framework described in chs. 48.31 and 48.99 RCW controls insurance receiverships. The receiver is empowered to take control and possession of all assets and rights of action of an insurance company and to bring claims on behalf of the company. RCW 48.31.040, .060, .131(2). The receiver may choose to rehabilitate the company or to liquidate it. RCW 48.31.040, .050. Should the receiver opt to liquidate the company, no action may be commenced against the insurance company or the receiver. RCW 48.31.131. Any potential creditor must timely present a "proof[] of claim" to the receiver. RCW 48.31.310. The receiver determines whether the claim is valid, subject to confirmation by the superior court. RCW 48.31.145. Those claims that are valid are then paid out according to a

---

[5] *See* RCW 48.31.030.

7

statutorily-defined priority scheme. RCW 48.31.280. The priority classes described in the statute are strictly applied and may not be circumvented "through the use of equitable remedies." RCW 48.31.280.

Even if a creditor does not have priority to recover from the insolvent company, it may be able to set off its debts to the company against debts to the creditor. RCW 48.31.290(1) allows "mutual debts or mutual credits" to be "set off" such that the payor will only be responsible for the balance. The "mutual debts or mutual credits" test derives from federal bankruptcy law[6] and is used in many states' insurance codes. *See, e.g.,* FLA. STAT. § 631.281(1); N.Y. INS. LAW § 7427; CAL. INS. CODE § 1031.

## II. STANDARD OF REVIEW

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *City of Sequim v. Malkasian,* 157 Wn.2d 251, 261, 138 P.3d 943 (2006). If reasonable minds can differ on facts controlling the outcome of the litigation, then there is a genuine issue of material fact and summary judgment is improper. *Ranger Ins. Co. v. Pierce County,* 164 Wn.2d 545, 552, 192 P.3d 886 (2008).

We review a motion for summary judgment de novo and construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Dowler v. Clover Park Sch. Dist. No. 400,* 172 Wn.2d 471, 485, 258 P.3d 676 (2011); *see also Folsom v. Burger King,* 135 Wn.2d 658, 663, 958 P.2d 301 (1998). But if the issue at bar requires the weighing of "competing, apparently competent evidence," then summary judgment is improper and we will reverse and

---

[6] Bankruptcy Act of 1898, ch. 541, § 68(a), 30 Stat. 544, 565 ("In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."), *repealed by* Bankruptcy Reform Act of 1978, Pub. L. 95-598, 92 Stat. 2683.

remand for a trial to resolve the factual issues. *Larson v. Nelson*, 118 Wn. App. 797, 810, 77 P.3d 671 (2003).

### III. OFFSETS AND MUTUALITY

Statewide and Matar argue that the Commissioner's claim is overstated because Statewide was entitled to set off several asserted debts owed by Cascade to Statewide: $230,000 that Cascade charged to Statewide's account pursuant to an unenforceable agreement, as well as $272,763.20 and $205,893.38 that Cascade withdrew from the trust account without crediting Statewide. The Commissioner argues that these amounts could not be set off against the amount that Statewide improperly withheld between April and December of 2005, as a matter of law. We agree with the Commissioner and affirm the superior court.

RCW 48.31.290(1) allows only "mutual debts or mutual credits" to be set off against an insurer in receivership. Where no Washington authority defines this phrase in the insurance insolvency context, we look to the common law of other states with similar provisions, as well as federal bankruptcy law, for guidance. *St. John Med. Ctr. v. State ex rel. Dep't of Social & Health Servs.*, 110 Wn. App. 51, 60, 38 P.3d 383 (citing *State v. Compton*, 13 Wn. App. 863, 865, 538 P.2d 861 (1975); *Garamendi v. Exec. Life Ins. Co.*, 17 Cal. App. 4th 504, 515, 21 Cal. Rptr. 2d 578 (1993)), *review denied*, 146 Wn.2d 1023 (2002).

In bankruptcy law, debts are "mutual" only if they are "'between the same parties and in the same right.'" *Allied Sheet Metal Fabricators, Inc. v. Peoples Nat'l Bank of Wash.*, 10 Wn. App. 530, 537, 518 P.2d 734 (quoting 10 AM. JUR. 2D BANKS § 666 (1963)), *review denied*, 83 Wn.2d 1013, *cert. denied*, 419 U.S. 967 (1974). This means that no offset is allowed if the bankrupt and the claimant stand in different capacities to one another, such as when the debt "arises from a fiduciary duty or in the nature of a trust." *In re Drexel Burnham Lambert Grp.,*

9

*Inc.*, 113 B.R. 830, 847 (Bankr. S.D.N.Y. 1990); *see also Dakin v. Bayly*, 290 U.S. 143, 146, 54 S. Ct. 113, 78 L. Ed. 229 (1933); *Fore Improvement Corp. v. Selig*, 278 F.2d 143, 145 (2d Cir. 1960); *In re Westchester Structures, Inc.*, 181 B.R. 730, 739 (Bankr. S.D.N.Y. 1995); *In re Mastroeni*, 57 B.R. 191, 193 (Bankr. S.D.N.Y. 1986). This is because "when a trustee accepts his beneficiary's promise he takes the risk of his insolvency," and the trustee cannot secure this risk against the assets entrusted to him. *Topas v. John MacGregor Grant, Inc.*, 18 F.2d 724, 726 (2d Cir. 1927), *cert. denied*, 274 U.S. 754. A trustee who did so would run afoul of "the fundamental principle that a fiduciary may never deal for his own profit with the subject-matter of his trust." *Morris v. Windsor Trust Co.*, 213 N.Y. 27, 32, 106 N.E. 753 (1914) (citing *Britton v. Ferrin*, 171 N.Y. 235, 63 N.E. 954 (1902)).

The same principles apply to insurance law. In most cases, an insurance agent will not be allowed to set off amounts owing to its parent insurer against premiums that it holds for the insurer in a fiduciary capacity. *See, e.g., Garrison v. Edward Brown & Sons*, 25 Cal. 2d 473, 476-77, 154 P.2d 377 (1944); *Harnett v. Nat'l Motorcycle Plan, Inc.*, 59 A.D.2d 870, 399 N.Y.S.2d 242 (1977); *In re New York Title & Mortg. Co. (Series Q-1)*, 260 A.D. 729, 730, 23 N.Y.S.2d 303 (1940). The courts distinguish between creditor-debtor relationships on one hand and trustee-beneficiary relationships on the other. *See Hershey v. Kennedy & Ely Ins., Inc.*, 294 F. Supp. 554, 557-58 (S.D. Fla. 1967), *aff'd*, 405 F.2d 888 (5th Cir. 1968); *Bohlinger v. Ward & Co.*, 34 N.J. Super. 583, 588, 113 A.2d 38 (1955); *United Ben. Fire Ins. Co. v. Earl*, 186 Neb. 175, 178, 181 N.W.2d 841 (1970).

This distinction is important because when an insurance agent holds premiums on behalf of its parent insurer, it holds those premiums "not . . . as an offset to a debt owing but rather as a trust fund for the benefit of its insurer or, as here, the successor in interest, the liquidator."

*Bohlinger v. Zanger*, 306 N.Y. 228, 234, 117 N.E.2d 338 (1954). That is, the insurance agent is not a creditor of the insurer, but a curator of money that already belongs to the insurer by virtue of the fiduciary relationship. "Where a premium due to an insurance company is paid by a policy holder to an authorized agent of the company, the payment is deemed in the law to have been made to the company whether the agent remits it to the company or not." *Bohlinger*, 34 N.J. Super. at 591.

At all times in Cascade and Statewide's relationship, Statewide held all premiums it collected in a fiduciary capacity for the benefit of Cascade. The parties agreed from the very inception of the agency agreement that Statewide would hold all premiums in a fiduciary capacity for Cascade's benefit. CP at 79, 395 ("[I]t shall be conclusively presumed that [Statewide] is a fiduciary of [Cascade] with respect to trust funds."); CP at 475 ("All premiums are the property of [Cascade] and shall be held by [Statewide], in a separate account, and in a fiduciary capacity as trustee for [Cascade].").

But even if these contractual provisions did not apply, Statewide was presumed a fiduciary by statute. RCW 48.17.480(3) states that any insurance agent who receives funds "which belong to or should be paid to another person as a result of or in connection with an insurance transaction is deemed to have received the funds in a fiduciary capacity." California, the state where Statewide operated, has an equivalent provision. *See* CAL. INS. CODE § 1733 ("All funds received by any person acting as a licensee under this chapter . . . as premium or return premium on or under any policy of insurance or undertaking of bail, are received and held by that person in his or her fiduciary capacity.").

As Cascade's fiduciary, Statewide was obligated to manage all premium receipts for the benefit of Cascade.[7] Outside of deducting the commission provided for by its agency agreement, Statewide was not at liberty to dispose of the premiums for its own benefit, not even to make up for amounts that Cascade had allegedly taken from it (or failed to credit) in the past. The statute provides only one way for a party to recover amounts owed to it by an insolvent insurer: through the proof of claims process. RCW 48.31.280, .310(1). Allowing Statewide to set off the amounts Cascade allegedly owed it would "sanction a preference at the expense of other policyholders and creditors," circumventing the statutory scheme for distribution of receivership assets. *Bohlinger v. Ward & Co.*, 20 N.J. 331, 336, 120 A.2d 1 (1956).

As a matter of law, neither the $230,000 that Cascade allegedly bullied Statewide into paying nor the $272,763.20 and $205,893.38 that Cascade allegedly withdrew and then failed to credit may be offset against the premiums that Statewide improperly withheld. These claims did not raise a genuine issue of material fact.

## IV. EXPERT FOUNDATION

We now turn to Huang and the propriety of relying on her financial analysis. Statewide and Matar argue that the Commissioner's expert, Huang, lacked the foundation to testify about the amount Statewide owed because she lacked personal knowledge regarding Statewide's balances prior to 2004 or regarding the control and operation of premium trust accounts. The Commissioner argues that Huang did not need to know about Statewide's dealings with Cascade prior to 2004 to determine how much Statewide owed as a result of its improper withholding

---

[7] Statewide argues that some of the premium receipts were not trust funds because they were held in a separate account. This argument is not well taken. The premiums were paid to Cascade's agent as payment for Cascade policies. By statute, they had to be held in a fiduciary capacity for Cascade.

12

between April and December 2005. We agree with the Commissioner and affirm the superior court. As described above, Statewide had no right to withhold premiums in order to make up for amounts Cascade had taken from it in the past. Therefore, the dealings between the parties prior to 2004 were not relevant.

The trial court has wide discretion in ruling on the admissibility of expert testimony. *State v. Fagundes*, 26 Wn. App. 477, 483, 614 P.2d 198, 625 P.2d 179, *review denied*, 94 Wn.2d 1014 (1980). ER 702 permits testimony by a qualified expert where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."

In order to determine the amount Statewide improperly withheld between April and December 2005, only two pieces of information were required: the amount of money Statewide collected during that time and the amount of money Statewide was entitled to hold back as commission. Huang had both pieces of information: she calculated the amount of money Statewide collected from Statewide's own monthly production reports, and she calculated the proper amount of deductions from "the General Agency Agreement and the past course of conduct by Statewide." CP at 427. Huang's testimony was not mere speculation, but was properly based on facts "made known to the expert" prior to the hearing. ER 703.

Similarly, Statewide and Matar's argument that Huang did not know about the control and operation of premium trust accounts is unavailing. Statewide and Matar cite to the record where Huang testifies that she was "not in charge of premium accounting" and did not know about the "control of the premium trust account when it was under the control of Cascade." CP at 667. As Matar himself declares, the trust account was under the exclusive control of Cascade until only 2004. Huang's lack of knowledge about the operation of the premium trust account

13

then goes to the time prior to 2004. Huang's lack of knowledge about the parties' dealings before 2004 is not relevant to the amount Statewide owed for April through December 2005. The trial court did not abuse its discretion by admitting and relying on Huang's testimony.

## V. LOSS RATIO

Statewide and Matar next argue that Cascade changed the loss ratio in its agency agreement without Statewide's knowledge, and that applying the original loss ratio described in the January 2004 contract would have shown that Statewide owed the Commissioner less money than the Commissioner claimed. The trial court disagreed, holding that to the extent the new loss ratio affected the amounts owing for 2004, it was not relevant to the amount of Statewide's improper withholdings between April and December 2005. The trial court's decision is justified by the aforementioned law barring offsets by a fiduciary. Under the plain terms of Statewide and Cascade's agreement, any adjustments based on the loss ratio were payable on demand and would not carry over between years. Statewide did not demand a loss ratio adjustment for 2004 and, in any event, could not unilaterally claim such an adjustment under either the contract or offset law. That is, the legal principle that a fiduciary cannot offset against amounts held in trust precludes the *2004* loss ratio adjustments from being a material fact on the issue of whether Statewide's *April through December 2005* withholdings were justified.

To the extent the new loss ratio affected the amounts owing for 2005, the alteration to the loss ratio provision could have been material to the case. But Statewide failed to demand a loss ratio adjustment for 2005, as required by the agreement. As a fiduciary of Cascade, Statewide was not entitled to use self-help remedies to recoup amounts it believed it was owed under the contract. Furthermore, as the trial court points out, Statewide's failure to make a timely demand for its 2005 adjustment indicates that either the new loss ratio did not make a difference or

Statewide was not diligent in reviewing the Commissioner's demand. To date, Statewide has not offered any pleadings as to how the disputed loss ratio provision would actually affect the April through December 2005 net premiums. That is, even if the validity of the new loss ratio was an issue of fact, Statewide and Matar failed to show how it was material. We affirm.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

## VI. PERSONAL LIABILITY

Statewide and Matar argue that Matar is not liable for the Commissioner's claim because his personal guarantee was obtained without consideration or, in the alternative, by fraud. The Commissioner argues that Statewide and Matar waived these arguments by failing to raise them during the summary judgment proceeding. The Commissioner is correct—Matar unreasonably failed to bring the issue to the trial court's attention.

Under RAP 2.5(a), appellate courts will generally not consider issues raised for the first time on appeal. *See also State v. McDonald*, 138 Wn.2d 680, 691, 981 P.2d 443 (1999); *Hoflin v. Ocean Shores*, 121 Wn.2d 113, 130-31, 847 P.2d 428 (1993); *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988). As the Commissioner points out, Matar did not raise the issue of personal liability in his pleadings on summary judgment nor at oral argument.

Statewide and Matar do not dispute this, but instead argue that parts of the record pointed to the possibility of fraud or lack of consideration. Statewide and Matar argue that "[t]he Trial Court Judge is obligated to review all of the evidence and consider all of the issues raised by the evidence—courts have even been known to make decisions based on the court's independent legal analysis even when the basis for the court's ruling was not a basis argued for by any of the

parties involved." Reply Br. of Appellant at 10. But courts are not generally *required* to raise issues sua sponte. *See, e.g., State v. Watkins*, 71 Wn. App. 164, 172-73, 857 P.2d 300 (1993) (no duty to hold a competency hearing where parties do not challenge competency of witnesses at trial). Matar provides no authority for his novel theory that RAP 2.5(a) does not apply so long as an issue *could have* been raised on the evidence presented. Such a rule would undermine RAP 2.5 and shift the burden of developing legal arguments from the parties to the court. We reject Matar's argument.

Statewide and Matar also contend that Matar's arguments concerning personal liability should not be barred because the Commissioner failed to establish facts upon which relief can be granted. The requirement to "'establish facts upon which relief can be granted'" is a lenient one, akin to the language "'failure to state a claim.'" *Roberson v. Perez*, 156 Wn.2d 33, 40, 123 P.3d 844 (2005) (citing 1 WASHINGTON COURT RULES ANNOTATED RAP 2.5 cmt. (a) at 640 (2d ed. 2004)). The Commissioner introduced Matar's personal guarantee of payment of the trust funds—certainly, a fact upon which relief could be granted. Statewide and Matar cannot show that the Commissioner failed to state a claim. We affirm.

JOHANSON, C.J.

We concur:

WORSWICK, J.

MELNICK, J.

16