707 A.2d 958

COUNTY OF MORRIS, PLAINTIFF–RESPONDENT, v. WILLIAM FAUVER, COMMISSIONER OF THE NEW JERSEY DEPART-MENT OF CORRECTIONS, THE NEW JERSEY DEPARTMENT OF CORRECTIONS AND THE STATE OF NEW JERSEY, DE-FENDANTS–APPELLANTS.

Argued December 1, 1997—Decided March 9, 1998.

84

86

*Joseph L. Yannotti,* Assistant Attorney General, argued the cause for appellants (*Peter Verniero,* Attorney General of New Jersey, attorney; *Mr. Yannotti* and *Mary C. Jacobson,* Assistant Attorney General, of counsel; *Andrew R. Sapolnick,* Deputy Attorney General, on the briefs).

*W. Randall Bush,* First Assistant County Counsel, argued the cause for respondent (*Ronald Kevitz,* Morris County Counsel, attorney).

*Benjamin D. Leibowitz,* Deputy County Counsel, argued the cause for *amicus curiae,* County of Middlesex (*Bruce J. Kaplan,* Middlesex County Counsel, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents yet another facet of the prison overcrowding crisis in New Jersey. In *County of Gloucester v. State,* 132 *N.J.* 141, 623 *A.*2d 763 (1993), and *Worthington v. Fauver,* 88 *N.J.* 183, 440 *A.*2d 1128 (1982), we addressed the State's authority to house state prisoners in county facilities under executive orders issued under the Civil Defense and Disaster Control Act ("CDDCA" or "Disaster Control Act"), *N.J.S.A.* App. A:9–30 to – 63. In this appeal, we address a similar issue under the County Correctional Policy Act ("CCPA"), *N.J.S.A.* 30:8–16.3 to –16.12.

Specifically, this appeal concerns the per diem reimbursement rate due the County of Morris ("County") from the State under their CCPA contract for housing state prisoners in the County's prison facilities.

## I.

## A.

### Commissioner's Authority to House State Prisoners in County Facilities

On June 19, 1981, in response to the problem of prison overcrowding, which had reached "crisis dimensions" by the early 1980s, Governor Brendan Byrne issued Executive Order No. 106. *Worthington, supra,* 88 *N.J.* at 188–89, 440 *A.*2d 1128. That Order declared state prison overcrowding to be an emergency under the Disaster Control Act. *Id.* at 188, 190, 440 *A.*2d 1128. Under the authority of the emergency powers of that Act, the Order permitted the Commissioner of Corrections to alleviate the overcrowding problem temporarily by housing state-sentenced prisoners in county correctional facilities for the 90–day duration of the Order. *Id.* at 190–91, 440 *A.*2d 1128. That Order also directed the Commissioner to develop an appropriate program to compensate those counties holding state prisoners. *Id.* at 191, 440 *A.*2d 1128.

In *Worthington, supra,* this Court upheld the validity of the Governor's Orders because they had a basis in legislative authority—the Disaster Control Act—as well as a limited time span. *Id.* at 200–02, 440 *A.*2d 1128. The Court cautioned, however, that the Disaster Control Act did not permit a permanent delegation of power to the Governor to authorize the reallocation of prisoners by executive order; rather, if the Legislature wanted to change the prison housing system officially, "it could pass a statute to that effect." *Id.* at 203, 440 *A.*2d 1128.

The Legislature responded by passing the County Correctional Policy Act. The CCPA attempts to address the overcrowding crisis

by establishing a "long-term, financial assistance program to provide State grants to participating counties to renovate and construct county correctional facilities so that county correctional services may be developed, implemented, operated and improved." *N.J.S.A.* 30:8–16.5(a). In return, the Act permits the Commissioner of the Department of Corrections ("DOC") to house state prisoners, excluding those with anticipated periods of confinement in excess of twenty-four months and those convicted of certain sexual offenses, in medium and minimum security county facilities. *N.J.S.A.* 30:8–16.5(b). The counties are instructed to establish a twelve member county corrections advisory board responsible for developing a comprehensive plan to provide, among other things, for the allocation of bed space for the housing of state prisoners and for the formation of "per diem reimbursement rates favorable to the State." *N.J.S.A.* 30:8–16.7. As noted by the Appellate Division, however, "there is no indication in the record when or if such a board was constituted in Morris County." *County of Morris v. Fauver*, 296 *N.J.Super.* 26, 30 n. 3, 685 *A.*2d 1342 (1996). Nevertheless, pursuant to the County Correctional Policy Act, the DOC entered into a contract for renovation and housing with the County of Morris, as well as with the following counties: Atlantic, Bergen, Camden, Cumberland, Gloucester, Hudson, Middlesex, Mercer, Monmouth, Ocean, Passaic, Somerset, and Union.[1]

Despite the passage of the CCPA and the DOC's contracts with various counties, however, the executive prison orders still remained in effect. They were extended continuously over the next twelve years by sixteen more executive orders issued by three different governors. *County of Gloucester, supra,* 132 *N.J.* at 149, 623 *A.*2d 763. Finally, in 1993, in *County of Gloucester, supra,* this Court held that prison overcrowding could no longer be classified as an "emergency" under the Disaster Control Act and,

---

[1] At oral argument, counsel for the State, Assistant Attorney General Joseph L. Yannotti, informed the Court that the Counties of Middlesex, Gloucester, and Hudson also have filed lawsuits against the State based on the payment provisions of their contracts with the DOC.

thus, the line of executive orders were no longer valid. *Id.* at 150, 606 *A.2d* 843. The Court stated that the long-term overcrowding problem called for a more permanent legislative solution. *Id.* at 152, 606 *A.2d* 843.

In response to that observation by the Court, the Legislature passed *P.L.* 1994 *c.* 12, which declared once again that state prison overcrowding was an emergency and gave the Governor, for two years, independent statutory authority to issue executive orders deemed "necessary and appropriate to respond to the crowding problem." In 1996, the Legislature extended the Governor's authority in that area for an additional two years. *P.L.* 1996 *c.* 9. Pursuant to those two statutes, two more executive orders were issued allowing the DOC to house state inmates in county facilities for appropriate compensation. Executive Order No. 16 (1994); Executive Order No. 48 (1996). Thus, from the time period around 1981 or 1982 to date, the Commissioner has had the authority to house state prisoners in county facilities through the executive orders as well as under the CCPA and financial assistance contracts with the counties.

## B.

*The Contract, Reimbursement Rates, and Actions of the Parties*

In 1983,[2] pursuant to the CCPA, the DOC and the County of Morris entered into the Morris County Correctional Facility Assistance Contract ("MCCFAC"). That contract provided that the County would "construct a forty bed addition and make renovations to its county correctional facility" in exchange for $2,156,676, which the Legislature had appropriated to the DOC to assist the County in meeting the construction costs of its facility. On the completion of that facility, the County was required to make available to the DOC forty cells to house forty minimum or

---

[2] While the typewritten date on the first page of the contract says May 11, 1983, which is the date stated in both the Appellate Division opinion and the parties' briefs, the handwritten date below the signatures reads June 9, 1983.

medium security state prisoners, with certain restrictions on the identity of such prisoners.

Paragraph 11 set forth the method for computing the per diem reimbursement rates required under the CCPA as well as the forty-year term of the contract:

> The Department shall pay the County a per-diem rate for housing of State prisoners in the 40 cells reserved for such prisoners in the county correctional facility. The rate shall be 75% of the average of the budgeted daily costs of housing state prisoners in the State prisons at Trenton, Rahway and Leesburg during that fiscal year. The 75 per cent per-diem rate shall remain in effect until such time as the total monies retained by the Department because of the discount equals $120,680.00. Thereafter, the County shall continue to make available to the Department a total of 40 cells for use by State prisoners, but the per-diem rate shall be 100 percent of the average daily cost of housing State prisoners in the State prisons at Trenton, Rahway and Leesburg during that fiscal year. The County shall continue to make 40 cells available to the Department for use by State prisoners for the useful life of the facility, as set forth in N.J.S.A. 40A:2-22 (forty years). At the end of this period, the Commissioner and the County shall reassess the need for continued use of the 40 cells by the Department, and may negotiate a continuation of this agreement upon such terms as are deemed appropriate.

Paragraph 12 provided that the ordinary and reasonable costs of housing the State prisoners in the county facility, including the costs of housing, facility maintenance, security, food, routine medical and dental care, prescriptions, transportation, and salaries of County personnel used to provide those services would be encompassed in the per diem rate. Furthermore, the DOC also was required to reimburse the County for the costs of all extraordinary and necessary medical, dental, surgical, psychiatric, and hospital services.

According to interrogatory answers by the Commissioner of the DOC, the County " 'began to house state inmates pursuant to the MCCFAC [the contract] in Fiscal Year 1986, beginning with the period October 1, 1985, through December 31, 1985.' " *County of Morris, supra,* 296 *N.J.Super.* at 32, 685 *A.*2d 1342 (alterations in original). At that time, " 'the average of the budgeted daily costs of housing state prisoners in the state prisons at Trenton [New Jersey State Prison], Rahway [East Jersey State Prison] and Leesburg [Bayside State Prison] ... was $36.51.' " *Ibid.* (alterations in original). For various other years, according to the

Appellate Division, the average per capita costs for state prisoners, which were supposed to be the measure of payment under the contract, were the following: 1985—$36.87; 1986—$36.51; 1987—$42.74; 1988—$45.43; 1989—$48.26; 1990—$49.79; 1991—$53.13; 1992—$51.75; 1993—$56.87. *Id.* at 29 n. 1, 685 *A.2d* 1342.

Prior to the time that the DOC began to house contract prisoners in Morris County, any state prisoners housed in the County's facilities were executive order prisoners. According to statements by William Fauver, the Commissioner of the DOC, the reimbursement rates for executive order prisoners were initially determined through separate negotiations with each county. As that became too cumbersome, the DOC set a uniform rate of compensation comparable to the costs of housing prisoners in one or various state prisons. The per diem reimbursement rate for executive order prisoners was $42.95 per inmate for fiscal year 1981, $45.00 beginning in fiscal year 1985, and $58.50 as of 1994. *Ibid.*

On September 7, 1984, before any state prisoners were housed in the County under the MCCFAC, Commissioner William Fauver wrote a letter to Captain John Delaney of the Morris County Jail stating:

Please be advised that the Department of Corrections has increased the per diem rate for housing State-sentenced inmates in the county facilities to $45.00 effective July 1, 1984. This rate will be paid through Fiscal Year 1985 to all counties who are housing State-sentenced inmates beyond the fifteen-day exclusionary period.

That letter made no explicit mention of the type of prisoners—executive order, contract, or both—to which it was referring.

Approximately one year after that letter, state prisoners were first housed in Morris County under the MCCFAC. Based on Fauver's letter, the County submitted invoices to the DOC under the contract in the amount of $45 per prisoner per day. The State paid the DOC that amount. The $45 rate paid under the contract was, for three years (1985–1987), more than the average daily cost of housing in state prisons, the amount referred to in the contract. Thus, for those years, the State overpaid the amounts due. In the years subsequent to 1988, however, the $45 amount was lower

than that required under the contractual terms. Therefore, for that period, the State underpaid the rates in the contract. In all that time, neither party inquired into nor questioned the propriety of the $45 amount. *County of Morris, supra,* 296 *N.J.Super.* at 33, 685 *A.*2d 1342.

## C.

### *Procedural History*

On April 7, 1992, almost seven years after it first began to house state prisoners, the County notified the Commissioner, pursuant to the notice provisions of the Contractual Liability Act, *N.J.S.A.* 59:13–1 to –10, that the DOC had breached the payment provisions of the contract. The notice stated:

> The State has been paying the County at the rate of $45.00 per prisoner per day purportedly based on the State's average per diem rate. However, on October 23, 1989 William H. Fauver, Commissioner of the New Jersey Department of Corrections testified under oath in United States District Court Civil Action No. 82–1946 entitled "Camden County, et. al. v. John J. Parker, Warden, et. al [sic]" that the cost to house a state sentenced prisoner in the Trenton State facility was $63.00 per day.... Furthermore, based upon information and belief, the present average cost to house a State prisoner is approximately $65.00 per day.

Alleging that the DOC had "failed to reimburse the County for the entire per diem rate which the County [was] entitled to" under the contract, the County sought $2,604,000 in damages, representing the twenty-dollar difference between $45 and $65 for 40 prisoners for 3255 days, the time period from May 11, 1983 to April 7, 1992. Even after it sent that notice, however, the County continued to submit invoices at the $45 rate. *County of Morris, supra,* 296 *N.J.Super.* at 33, 685 *A.*2d 1342.

On October 14, 1992, the County filed suit against the Commissioner, the DOC, and the State. In June 1994, the County filed a motion for partial summary judgment, claiming it was entitled to $407,879.97 for the period covering Fiscal Years 1988 through 1993. The Commissioner cross-moved for summary judgment, and the trial court granted the Commissioner's motion.

In its order dated December 5, 1994, the court found that from 1985 until 1992 both parties ignored the payment terms of Paragraph 11 of the contract. The court ordered that the contract terms would govern in the future, but for all periods up to the date of the court's order in which the County submitted vouchers for $45 per day, the County was not permitted to seek any payment beyond the amounts it had already received. In a modified order on January 5, 1995, the trial court held that as of October 14, 1992, the date the County filed its action against the DOC, the County was insisting on its right to be paid according to the terms of Paragraph 11. Therefore, the court concluded, the payment provisions of the contract would be enforced as of that date. Furthermore, Morris County would be reimbursed for any difference in rates that had occurred after the filing of its action, despite the fact that the County had continued, until the court's order, to submit invoices at the $45 rate. After the court's decision, the County submitted vouchers to the State at a per diem rate of $58.50, "[without] prejudice as to any future submittals." *County of Morris, supra,* 296 *N.J.Super.* at 35, 685 *A.2d* 1342.

The Appellate Division reversed. *County of Morris, supra,* 296 *N.J.Super.* 26, 685 *A.2d* 1342. That court found that the parties did not completely abandon the contract because they adhered to its material portions—the advancement of construction funds and the housing of State prisoners. Furthermore, the parties did not partially modify the payment terms of the contract because there was neither mutual assent to modify nor new consideration to support such a modification. The court instead concluded that the County had been misled.

To determine whether and to what extent any damages were warranted, the Appellate Division analyzed whether the Contractual Liability Act, *N.J.S.A.* 59:13–1 to –10, applied. The Contractual Liability Act bars recovery in contract actions against the State if a notice of claim is not submitted to the State within ninety days of the claim's accrual. *N.J.S.A.* 59:13–5. Because the Appellate Division believed that the State was the only party privy

over the years to the true facts regarding the accuracy of the State's payments, the court used the discovery rule to determine the accrual date of the County's claim. Finding that the County's claim accrued when the County first became aware of the State's breach in 1992, the court declared that the County's notice of claim against the State, filed shortly after that discovery, satisfied the requirements of the Act. Furthermore, because of the continuing nature of the State's breach, the court concluded that the restrictions in the Contractual Liability Act did not apply. The Appellate Division then remanded for a calculation of damages owed from the date that state prisoners were first housed in the County pursuant to the contract.

On May 21, 1997, we granted the Commissioner's petition for certification. 149 *N.J.* 409, 694 *A.*2d 194 (1997).[3]

## II.

The DOC argues that the parties abandoned or modified the MCCFAC by their actions over the years, and that, even if the payment terms of the contract were not abandoned or modified, the action is barred by equitable principles of laches, waiver, and estoppel. We disagree with those assertions.

## A.

### *Abandonment*

■ The ability to abandon or modify one's contract has been consistently upheld in New Jersey. It is well established in this State that, "[i]n the absence of some vested derivative interest in another, a contract may be modified, abrogated or rescinded by ... the contracting parties." *Gillette v. Cashion*, 21 *N.J.Super.* 511, 516, 91 *A.*2d 421 (App.Div.1952).

---

[3] By order dated October 29, 1997, we granted to the County of Middlesex leave to file a brief and argue *amicus curiae.*

However, an abandonment of a contract "can only take place by the consent of both parties, 'and requires as clear evidence of the waiver as of the existence of the contract.'" *Wheaton v. Collins,* 84 *A.* 271, 273 (Ch.1912) (citation omitted). To effectuate an abandonment, mutual assent is always required. *Gillette, supra,* 21 *N.J.Super.* at 516, 91 *A.*2d 421 ("mutual assent" needed to abrogate or rescind contract); *City of Del Rio v. Ulen Contracting Corp.,* 94 *F.*2d 701, 704 (5th Cir.1938) ("Rescission by abandonment requires mutual assent of the parties."). As with the formation of a contract, a proposal to terminate the contract by one party must actually be accepted by the other in order to constitute an abandonment. *See Gillette, supra,* 21 *N.J.Super.* at 516, 91 *A.*2d 421; *Ferber v. Cona,* 91 *N.J.L.* 688, 691, 103 *A.* 471 (E. & A.1918).

The determination of whether contracting parties intend to abandon their agreement need not be express; it may be inferred from all their acts and circumstances. *Mossberg v. Standard Oil Co.,* 98 *N.J.Super.* 393, 406, 237 *A.*2d 508 (Law Div.1967). As a general rule, a contract "will be treated as abandoned where one party acts in a manner inconsistent with the existence of the contract and the other party acquiesces in that behavior." *Dorchester Manor v. Borough of New Milford,* 287 *N.J.Super.* 163, 170–71, 670 *A.*2d 600 (Law Div.1994), *aff'd,* 287 *N.J.Super.* 114, 670 *A.*2d 576 (App.Div.1996). The intention to abandon a contract by actions or acquiescence, however, must be "clearly expressed." *Mossberg, supra,* 98 *N.J.Super.* at 406–07, 237 *A.*2d 508. Under New Jersey law, when rescission or abandonment of a contract "is to be implied from the conduct of the parties, the actions must be positive and unequivocal." *Anstalt v. F.I.A. Ins. Co.,* 749 *F.*2d 175, 178 (3d Cir.1984); *see also City of Del Rio, supra,* 94 *F.*2d at 704 ("Where conduct is relied upon, the acts of the parties must be positive, unequivocal and inconsistent with an intent to be further bound by the contract.").

Moreover, abandonment of a contract is similar to the remedy of rescission, which generally requires that the entire

contract be terminated. *County of Morris, supra,* 296 *N.J.Super.* at 37, 685 *A.*2d 1342. As a general rule, rescission "must be exercised in toto and is applied to the contract in its entirety with the result that what has been done is wholly undone and no contract provisions remain in force to bind either of the parties." *M.J. Merickel v. Erickson Stores Corp.,* 255 *Minn.* 12, 95 *N.W.*2d 303, 306 (1959). A contract, or a term or provision of a contract, cannot be partially rescinded. *Bonnco Petrol, Inc. v. Epstein,* 115 *N.J.* 599, 612, 560 *A.*2d 655 (1989); *see also Magliaro v. Modern Homes, Inc.,* 115 *N.J.L.* 151, 155, 178 *A.* 733 (E. & A.1935) ("[B]reach of an independent covenant ... does not, necessarily, make for a breach or abandonment of the entire contract on the part of the party thereto."). If a party were allowed to "repudiate the unfavorable parts of a contract and claim the benefit of the residue," it would amount to unjust enrichment and would bind the parties "to a contract which they did not contemplate." 17A *Am.Jur.2d Contracts* § 548 (2d ed.1991). Only where a contract is severable into different transactions may one of those separate transactions be avoided. *Bonnco Petrol, supra,* 115 *N.J.* at 612; , 560 *A.*2d 655; 17A *Am.Jur.2d Contracts* § 548 (2d ed.1991).

The County of Morris and the DOC did not abandon the MCCFAC. We agree with the Appellate Division that "[n]othing in the record warrants a conclusion that either party to the contract had clearly or implicitly rejected it." *County of Morris, supra,* 296 *N.J.Super.* at 36, 685 *A.*2d 1342. The words and actions of the parties, while perhaps demonstrating mistaken assumptions about their agreement, did not evidence a definite mutual intention to abandon the entire contract. Because there were no contract prisoners housed in Morris County at the time Commissioner Fauver wrote the letter stating that the per diem rate was now $45; because the letter referred to the fifteen-day period beyond which, at that time, State prisoners could not be housed absent the Governor's executive orders; because the letter never mentioned contract prisoners; and because the reimbursement rate for executive order prisoners had actually been in-

creased that year to a $45 amount, it is clear that the Commissioner's letter was intended to apply only to executive order prisoners. Therefore, in writing that letter, the Commissioner did not propose to abandon the contract and, contrary to the view of the Appellate Division, the County could not reasonably have relied on that letter as an offer to rescind. *See County of Morris, supra,* 296 *N.J.Super.* at 36, 685 *A.*2d 1342. Similarly, although the County submitted vouchers at the incorrect rate of $45 per day, it too did not express a clear intention to terminate the contract. While the County could have, and should have, researched or inquired into the propriety of the $45 amount, the County did not actually know at the time that $45 was not the appropriate rate of reimbursement. Without that knowledge, the County could not have intended, by insisting on those incorrect terms, to repudiate the outstanding provisions of the contract. Moreover, even if the County did so intend, finding the State's payment of the County's requests for $45 to be evidence of the State's acceptance of that intention would be illogical because, at the time the State began paying the $45 rate, that amount was more than the State was required to pay under the contract.

Finally and most importantly, although the parties acted inconsistently with the payment provisions of their contract, they did adhere to the material portions of their agreement. Because the State advanced construction funds, the County expanded its facilities, and the County housed State prisoners, the parties did not "completely ignore the contract and operate contrary to it or under the terms of a different agreement." *County of Morris, supra,* 296 *N.J.Super.* at 36, 685 *A.*2d 1342. The parties clearly did not terminate their agreement in its entirety and, because the payment provisions of the contract were not severable, they did not satisfy the requirements for abandonment.

The conclusions reached by the courts in *Mossberg, supra,* 98 *N.J.Super.* 393, 237 *A.*2d 508, and *Dorchester Manor, supra,* 287 *N.J.Super.* 163, 670 *A.*2d 600, do not compel a different result. In *Mossberg, supra,* the court found that the plaintiff's employment

contract was completely abandoned by a later collective bargaining agreement that fixed his wages for almost twenty years. 98 *N.J.Super.* at 407, 237 *A.*2d 508. The actions of the parties in that case are distinguishable, however, because they ignored their entire contract and they "clearly expressed" their intent to be governed by their new agreement. In *Dorchester Manor, supra,* the plaintiff developer entered into an agreement with the Borough of New Milford providing that the plaintiff would construct a development complex in accordance with the Borough's ordinances and the defendant would remove garbage from that development two days a week. 287 *N.J.Super.* at 167, 670 *A.*2d 600. The Borough failed to provide any such garbage service and instead paid the plaintiff random amounts of money for twenty years. *Id.* at 171, 670 *A.*2d 600. As a result, the court found that the contract had been abandoned. *Ibid.* Because the Borough never provided any garbage service at all, the abandonment in *Dorchester, supra,* is distinguishable from this case in which the State advanced construction funds and the County housed State prisoners.

### B.

### *Modification*

As with abandonment, parties to an existing contract may, by mutual assent, modify it. *Bohlinger v. Ward & Co.,* 34 *N.J.Super.* 583, 587, 113 *A.*2d 38 (App.Div.1955), *aff'd,* 20 *N.J.* 331, 120 *A.*2d 1 (1956). While abandonment of a contract requires repudiation of the entire contract, limited changes or amendments to a contract can be accomplished through modification. *Merickel, supra,* 95 *N.W.*2d at 306 (finding that rescission "by [m]utual agreement of a single provision of a contract is a modification or an amendment without a cancellation or a voidance of the contract as a whole"). Such modification can be proved by an explicit agreement to modify, or, like abandonment, by the actions and conduct of the parties, so long as the intention to modify is mutual and clear. *See* 17A *C.J.S. Contracts* § 375 (1963) ("[A]mbiguous

course of dealing from which one party might reasonably infer that the original contract was still in force, and the other that it had been changed," will not support a modification).

■■■■■ A proposed modification by one party to a contract must be accepted by the other to constitute mutual assent to modify. *Wheaton, supra,* 84 *A.* at 273 (holding that proposed modification of the contract, "not being accepted or acted on by either party, leaves both complainant and defendant to their equitable rights under the original contract"). Unilateral statements or actions made after an agreement has been reached or added to a completed agreement clearly do not serve to modify the original terms of a contract, especially where the other party does not have knowledge of the changes, because knowledge and assent are essential to an effective modification. *See Bonnco Petrol, supra,* 115 *N.J.* 599, 560 *A.*2d 655 (unilateral insertion by purchaser that option monies were to be applied towards purchase price, without pointing out insertion to other side before signing, was ineffective in changing contract). Finally, an agreement to modify must be based upon new or additional consideration. *Ross v. Orr,* 3 *N.J.* 277, 282, 69 *A.*2d 730 (1949) ("[T]he terms of an agreement may be altered or changed by a subsequent agreement if based on proper consideration.").

■■■ The County of Morris and the DOC did not modify the terms of their prisoner housing contract. As with abandonment, the parties did not clearly express a mutual intention to modify their contract, nor did one party demonstrate knowledge and acceptance of the other party's expressed intentions. As discussed previously, the State's letter was intended to apply only to executive order prisoners and, thus, was not intended to modify the payment provisions of the contract. In addition, because the County was unaware that $45 was not the correct reimbursement amount, the County's submission of vouchers at that rate did not demonstrate a purpose to transform the agreement. Finally, there seems to have been no consideration given for the alleged modification of the contract.

Various cases from other jurisdictions dealing with attempts to modify contract payment provisions are consistent with our conclusions. In *B.C. Truck Lines, Inc. v. Kelley,* the parties entered into a contract whereby the plaintiff was to receive 70% of whatever amount the defendant received for each load hauled by the defendant in the plaintiff's truck. 93 *Ga.App.* 529, 92 *S.E.*2d 309, 310 (1956). When the defendant began paying only 60% instead of 70%, and then continued to pay that amount for almost two years, the defendant insisted that there had been a mutual departure from their contract. *Ibid.* The plaintiff disagreed, contending that he thought the 10% was being withheld to be applied to a stock purchase for his benefit. *Ibid.* Finding for the plaintiff, the court stated that "[t]he mere acceptance of a lesser amount in and of itself does not show a mutual departure." *Ibid.;* 17A *C.J.S. Contracts* § 375 (1963). Similarly, in *Walker v. Associated Dry Goods Corp.,* 231 *Md.* 168, 189 *A.*2d 91, 97 (1963), the court held that there was no modification of the parties' agreement because the "mere acceptance by the [plaintiffs] for several years of payments in less amounts than they were entitled to under the lease does not evidence an intention on their part to modify the terms of the lease."

Also, when a party overpays on a contract for a number of years, as a result of an error in computation or misinterpretation or mistake of fact, that party may generally recover that overpayment and will not be obligated to continue overpaying. 13 *Williston on Contracts* § 1574 (Jaeger ed.1961); *Liebeskind v. Mexican Light & Power Co.,* 116 *F.*2d 971, 974 (2d Cir.1941). In *Liebeskind, supra,* where the defendant was required to pay interest coupons in Canadian dollars but continually paid certain coupons in United States currency, without regard to fluctuations in the rate of exchange, the defendant had not modified his agreement so as to require continued overpayment. *Ibid.* As noted by the court, "if a contract clearly demands a specified performance, the fact that the obligor has done more in part performance than the letter of his obligation required should not

be used to compel a similar over-performance of the remainder." *Ibid.*

Neither the County's acceptance of $45, a lesser amount than it was due, for the four years before it filed suit, nor the State's payment of $45, more than it owed, for the first three years of the contract, demonstrate that either party intended to modify their contract.

## C.

### *Mutual Mistake*

It does seem, however, that both parties have misinterpreted their respective rights and obligations under the contract. Although the State should have realized and then informed the County that the $45 amount was not the average cost specified under the contract, and although the State should have specified more clearly to which prisoners the letter referred, the State did not mislead the County, as the Appellate Division erroneously suggests. *See County of Morris, supra,* 296 *N.J.Super.* at 38, 685 *A.*2d 1342. Because of the letter's reference to the required fifteen-day transfer period, its lack of reference to contract prisoners, and the fact that the letter was sent before any contract prisoners were yet housed in Morris County's facilities, the County could not have reasonably relied on the letter as specifying the correct reimbursement amount. Moreover, the State had no incentive to pay the County $45 per day for contract prisoners at the time the letter was sent. When the County began to house contract prisoners, the actual daily cost of housing a prisoner at the three state prisons was $36.51. *County of Morris, supra,* 296 *N.J.Super.* at 29 n. 1, 32, 685 *A.*2d 1342. Furthermore, the terms of Paragraph 11 of the MCCFAC provided that the State was to pay 75% of the average rate ($27.38) to the County until the discount from the reduced rate equaled $120,680. Therefore, when the State began to pay the County, it was overpaying by $17.62 per prisoner per day. Because it was not in the State's interest to have made such overpayments, we do not find that the

State intended the $45 rate specified in the letter to apply to contract prisoners, nor do we find that the State attempted to mislead the County into thinking that it did apply. Finally, the average state housing rates were public information and, therefore, the County had an obligation to use reasonable diligence to inquire into the appropriate figure. As a result of both parties' lack of research regarding the accuracy of the payment rates, no party was misled, but both parties acted upon mistaken assumptions and mutually erred in the construction of their contract.

Where a contract is ambiguous, courts will consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation; where the terms of a contract are clear, however, the court must enforce it as written. *Koshliek v. Board of Chosen Freeholders,* 144 *N.J.Super.* 336, 344, 365 *A.*2d 492 (Law Div.1976). Furthermore, where both parties to a contract have erred in the construction of that contract, courts will generally not require that the parties continue in that mistaken construction, but will instead insist on a return to the written provisions of the contract. *Bellisfield v. Holcombe,* 102 *N.J. Eq.* 20, 31 (Ch.1927) ("Where terms, used in a written contract, are themselves susceptible of definite legal construction the fact that the parties have adopted and acted on an erroneous construction of the contract, will not preclude them, as to transactions not clear, from insisting on the proper and true legal construction.").

Considering the parties' mutual misconstruction of their contract, we hold that the payment terms of the MCCFAC, which were clear as written, not only should have been followed over the years, but also continue to apply. To avoid similar mistakes in the future, we conclude that the State must provide the County with regular reports stating the average costs of housing in the state prisons. Similarly, the County must regularly provide the State with the exact number of contract, as opposed to executive order, prisoners housed in the County's facilities.

### D.

### *Equitable Defenses*

As previously observed, we find that the equitable defenses of estoppel, laches, and waiver also do not bar the County's contract action. We discuss each principle briefly.

### *Estoppel*

Equitable estoppel is:

> The effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might otherwise have existed ..., as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse....
>
> [*Carlsen v. Masters, Mates & Pilots Pension Plan Trust,* 80 *N.J.* 334, 339, 403 A.2d 880 (1979) (citations omitted).]

In *O'Malley v. Department of Energy,* this Court stated: "Equitable estoppel is rarely invoked against a governmental entity.... Nonetheless equitable considerations are relevant to assessing governmental conduct, and may be invoked to prevent manifest injustice." 109 *N.J.* 309, 316, 537 *A.2d* 647 (1987) (citations omitted); *see also Township of Fairfield v. Likanchuk's, Inc.,* 274 *N.J.Super.* 320, 331, 644 A.2d 120 (App.Div.1994) (explaining that equitable estoppel is applied against governmental entities " 'only in very compelling circumstances' ") (citations omitted). This is so because "matters of public interest and legislative will should not be easily compromised by freely applying the doctrine of estoppel to irregular municipal conduct." *Juliano v. Borough of Ocean Gate,* 214 *N.J.Super.* 503, 507, 520 A.2d 418 (Law Div.1986). This case presents no such compelling circumstances, and therefore, the doctrine of estoppel cannot be invoked against the County to prevent it from pursuing its reimbursement claim.

### *Waiver*

Waiver "is the intentional relinquishment of a known right." *West Jersey Title & Guar. Co. v. Industrial Trust Co.,* 27 *N.J.* 144, 152, 141 *A.2d* 782 (1958). Waiver must be voluntary and there must be a clear act showing the intent to waive the right. *Ibid.* Furthermore, waiver "presupposes a full knowledge of the

right and an intentional surrender; waiver cannot be predicated on consent given under a mistake of fact." *Id.* at 153, 141 *A.*2d 782. For reasons previously expressed, there is no showing that the County voluntarily and knowingly waived its right to complete payment under the terms of the contract.

### *Laches*

 Laches "has been found where there is unexplainable and inexcusable delay in enforcing a known right whereby prejudice has resulted to the other party because of such delay." *Dorchester Manor, supra,* 287 *N.J.Super.* at 171, 670 *A.*2d 600. The policy behind laches is to discourage stale claims. *Ibid.* The time constraints imposed are flexible under the doctrine. *Lavin v. Board of Educ.,* 90 *N.J.* 145, 151, 447 *A.*2d 516 (1982). The factors to be considered when determining whether to apply laches include: length of the delay; reasons for the delay; and "changing conditions of either or both parties during the delay." *Id.* at 152, 447 *A.*2d 516. "It is assumed that the party to whom laches is imputed has knowledge of his rights, and sufficient opportunity to assert them in the proper forum." *Dorchester Manor, supra,* 287 *N.J.Super.* at 172, 670 *A.*2d 600. The other party, in contrast, may have good reason to believe those rights have been abandoned. *Ibid.*

 Because the County did not have knowledge of its claims against the State until many years after the incorrect payments began, laches does not apply. Although the County's delay in asserting its rights was long, the mistaken assumptions of the parties suggest that their claim should be permitted. Moreover, the conditions of the parties have not changed to an extent that justifies barring the County's claim.

### III.

### *The Contractual Liability Act*

Although we hold that the parties have not abandoned or modified the contract and that the cause of action is not barred by

equitable principles, the New Jersey Contractual Liability Act applies. Under that Act, although the MCCFAC must be enforced as written from here forward, the County is entitled to be reimbursed for some of the State's underpayments.

Prior to 1970, the State could not be sued in actions in tort or contract as a result of its sovereign immunity. *Frapaul Constr. Co. v. New Jersey Dep't of Transp.*, 175 *N.J.Super.* 84, 88, 417 *A.*2d 592 (App.Div.1980); Richard J. Hughes & William F. Hyland, *Report on the New Jersey Tort Claims and Contractual Liability Acts* 1 (July 1, 1975). The immunity from contract actions was first abolished as a common law doctrine by the Supreme Court in 1970 and was later abolished on a statutory basis by the passage of the Contractual Liability Act. *P, T & L Constr. Co. v. Commissioner, Dep't of Transp.*, 55 *N.J.* 341, 346, 262 *A.*2d 195 (1970); *Frapaul, supra*, 175 *N.J.Super.* at 88–89, 417 *A.*2d 592. The *Report of the Attorney General's Task Force on Sovereign Immunity*, which urged the passage of that Act, noted that most states and the federal government had already subjected themselves to liability for contract actions and that it is "unconscionable for a State to be permitted to repudiate a contract which it has voluntarily entered and which binds the other parties." George F. Kugler, Jr., Attorney General, *Report of the Attorney General's Task Force on Sovereign Immunity* 9 (May 1972).

Specifically, the Contractual Liability Act "waives [the State's] sovereign immunity from liability arising out of an express contract or a contract implied in fact and consents to have the same determined in accordance with the rules of law applicable to individuals and corporations." *N.J.S.A.* 59:13-3. The Contractual Liability Act also requires that all parties contracting with the State who wish to file a breach of contract suit against the government file a notice of claim with the contracting agency within ninety days of the accrual of their claim. *N.J.S.A.* 59:13-5. Failure to file a notice of claim within the appropriate time period results in a permanent bar against recovery, unless application is

made to a judge of the Superior Court giving "sufficient reason" for permission to file a late notice of claim. *N.J.S.A.* 59:13-5 to -6. If permission is granted, the notice of claim must then be filed within one year of the accrual of the claim. *N.J.S.A.* 59:13-6. The claimant will also be barred from recovering if he fails to file suit within two years of accrual of his claim or within one year after completion of the contract giving rise to the claim. *N.J.S.A.* 59:13-5. As noted by various courts, the purposes of the notice provisions of the Act are to give state agencies, which are often faced with large amounts of litigation, "an opportunity to determine the merits of the claims for the possibility of a settlement, as well as to investigate the claims for the purpose of preparing for trial." *Frapaul, supra,* 175 *N.J.Super.* at 92, 417 *A.2d* 592; *accord Housing Auth. of Newark v. Sagner,* 142 *N.J.Super.* 332, 343, 361 *A.2d* 565 (App.Div.1976).

We must first ascertain the date of accrual of the County's claim to determine when its notice of claim had to be filed. The Act itself states that " 'Accrual of claim' shall mean the date on which the claim arose and shall not be affected by the notice provisions contained herein." *N.J.S.A.* 59:13-2. In addition, courts have generally stated that a claim accrues, for statute of limitations purposes, on "the date on which 'the right to institute and maintain a suit' first arose." *Rosenau v. City of New Brunswick,* 51 *N.J.* 130, 137, 238 *A.2d* 169 (1968); *Deluxe Sales and Serv., Inc. v. Hyundai Eng'g & Constr. Co.,* 254 *N.J.Super.* 370, 374, 603 *A.2d* 552 (App.Div.1992).

In this case, we apply the installment contract approach described in *Metromedia Co. v. Hartz Mountain Associates,* 139 *N.J.* 532, 535, 655 *A.2d* 1379 (1995), to determine when the County's claim accrued. Under the installment contract method, claims based on installment contracts or other divisible, installment-type payment requirements accrue with each subsequent installment. In other words, a new statute of limitations begins to run against each installment as that installment falls due and a new cause of action arises from the date each payment is missed.

*Id.* at 535–36, 655 *A.*2d 1379. The Court in *Metromedia, supra,* noted that, absent a repudiation, a plaintiff may sue for each breach only as it occurs because "[t]o hold otherwise would allow a claimant to trigger the statute of limitations upon presentation of a claim rather than having the existence of a claim trigger the statute of limitations." *Ibid.* As a result, the Court found that where the defendant agreed to reimburse the plaintiff for cleaning costs, and for six and one-half years the plaintiff paid for the service but did not submit bills to the defendant, the plaintiff's "enforceable right" arose on a monthly basis, upon completion of the cleaning services and the accumulation of the right to payment. *Id.* at 533–35, 655 *A.*2d 1379. Therefore, the plaintiff in that case could recover only for those bills relating to the months for which the applicable statute of limitations had not expired at the time the plaintiff filed suit; any bills submitted for months more than six years before the suit was commenced were forever barred from recovery. *Id.* at 536, 655 *A.*2d 1379.

The installment contract approach has been applied in a variety of situations. As noted by the Court in *Metromedia, supra,* the theory has been used in connection with coupons on county bonds due annually, periodic payments for promissory notes, periodic payments under a divorce settlement, and monthly payments under an equipment lease. *Id.* at 535, 655 *A.*2d 1379. In *Ballantyne House Associates v. City of Newark,* 269 *N.J.Super.* 322, 331–32, 635 *A.*2d 551 (App.Div.1993), the Appellate Division found that Newark's failure to perform its garbage collection obligations, under the tax abatement agreements at issue in that case, "could be considered a series of continuing breaches for which plaintiffs could maintain an action for any breach occurring within six years of the filing of the complaint, even if more than six years had elapsed since Newark's initial breach." Similarly, courts in various jurisdictions have found that a new cause of action accrued monthly on electricity contracts where a new payment was due each month based on the customer's usage over that month, *Kiamichi Elec. Cooperative v. Underwood,* 842 *P.*2d 358 (Okla.Ct. App.1992); that the obligation to make pension fund withdrawal

liability payments was akin to the obligation to make payments on an installment contract, *Board of Trustees v. Kahle Eng'g Corp.,* 43 *F.*3d 852, 857 (3d Cir.1994); and that the dates of submission of invoices for payment were the dates on which a plaintiff's claims accrued, *Deluxe Sales and Serv., Inc., supra,* 254 *N.J.Super.* at 374–75, 603 *A.*2d 552.

The discovery rule should not be applied to determine when the County's claims accrued. The discovery rule provides that, "in an appropriate case, a cause of action will not accrue until the injured party discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action." *O'Keeffe v. Snyder,* 83 *N.J.* 478, 491, 416 *A.*2d 862 (1980). Although it seems "inequitable that an injured person, unaware that he has a cause of action, should be denied his day in court solely because of his ignorance, if he is otherwise blameless," it may also be "unjust, however, to compel a person to defend a law suit long after the alleged injury has occurred, when memories have faded, witnesses have died and evidence has been lost." *Lopez v. Swyer,* 62 *N.J.* 267, 274, 300 *A.*2d 563 (1973). Therefore, this Court has held that the equitable claims of the parties must be weighed against each other and that not every delayed discovery will justify the application of the rule. *Id.* at 274–75, 300 *A.*2d 563. As a result, the discovery rule has been applied most frequently in personal injury or negligence-type actions, which by their nature are often self-concealing or undiscoverable. Although the rule originally was developed to provide relief for plaintiffs in foreign body or other medical malpractice claims, *id.* at 273, 300 *A.*2d 563, the rule has since been extended to various other negligence-type suits, such as legal malpractice, *Grunwald v. Bronkesh,* 131 *N.J.* 483, 493–94, 621 *A.*2d 459 (1993); products liability suits, *id.* at 493, 621 *A.*2d 459 (citing *Burd v. New Jersey Tel. Co.,* 76 *N.J.* 284, 291–92, 386 *A.*2d 1310 (1978)); negligent miscalculation of acreage by a professional engineer and land surveyor, *Lopez, supra,* 62 *N.J.* at 273, 300 *A.*2d 563 (citing *New Market Poultry Farms, Inc. v. Fellows,* 51 *N.J.* 419, 241 *A.*2d

633 (1968)); and common law fraud, *Interlox Punch & Die Corp. v. Insilco Corp.*, 174 *N.J.Super.* 175, 176, 415 *A.*2d 1208 (Law Div.1980).

■ The rationale for employing the discovery rule in tort- or fraud-type actions, however, does not carry over to most contract actions, and therefore, the discovery rule generally has not been applied in such suits. Although some negligence or malpractice actions involve inherently undiscoverable types of injuries, most contract actions presume that the parties to a contract know the terms of their agreement and a breach is generally obvious and detectable with any reasonable diligence. Because the discovery rule imposes on plaintiffs an affirmative duty to use reasonable diligence to investigate a potential cause of action, and thus bars from recovery plaintiffs who had "reason to know" of their injuries, the discovery rule generally does not apply to contract actions. *See Berlen v. Consolidated Rail Corp.*, 291 *N.J.Super.* 542, 551, 677 *A.*2d 1150 (App.Div.1996) (finding affirmative duty to investigate); *O'Keeffe, supra,* 83 *N.J.* at 497–98, 416 *A.*2d 862 (imposing duty of reasonable diligence in investigation in order to toll statute of limitations); *D'Aries v. Schell,* 274 *N.J.Super.* 349, 363, 644 *A.*2d 134 (App.Div.1994) ("lack of diligence precluded plaintiff from benefiting from the discovery rule"); *cf. Gibbins v. Kosuga,* 121 *N.J.Super.* 252, 296 *A.*2d 557 (Law Div.1972) (applying discovery rule to breach of contract and misrepresentation action where plaintiffs did not find out and had no reason to know until ten years after they bought house that well supplying water was not located on their property, but not applying discovery rule to counterclaim in same action for $1500 never paid on promissory note).

■ In this case, the discovery rule does not apply. The present situation involves a contract with clear and explicit payment provisions. The actual payments due under the contract were readily discoverable through public information and calculation. Not only could the County have discovered the lack of adherence to the contractual reimbursement rate through the

exercise of reasonable diligence, but the County probably had actual knowledge that there existed a difference in payment as early as 1989, the time at which the Commissioner stated that the cost to house a State prisoner in Trenton was $63. Upon finding that a difference existed, the County should then have investigated the proper differential amount. The fact that the State overpaid for the first few years of the contract suggests that the incorrect payments were not entirely the fault of nor purposeful on the part of the State. Because both parties mutually erred and the County, as well as the State, should have discovered the mistake at an earlier time, the discovery rule is not appropriate.

 Instead, as we have indicated, the installment contract approach should be applied. The County submitted regular vouchers for reimbursement for the housing of State prisoners. Every time the County submitted a new voucher and the State did not pay the correct amount, the County's cause of action on that voucher accrued. Therefore, the County was obligated to file a notice of claim with the State, for each voucher on which it wished to sue, within ninety days of the submission of that voucher. Because the County did not file a notice of claim until April 7, 1992, the County met the notice requirements of the Contractual Liability Act only with respect to those invoices submitted within the ninety days before that date. As a result, we hold that the County is entitled to reimbursement for the difference between what was paid on the contract and what should have been paid under the contract for all invoice periods occurring on or after January 9, 1992 to date, but is barred from reimbursement for all periods occurring before that date. As required by *N.J.S.A.* 59:13-8 of the Contractual Liability Act, no prejudgment interest will be added to that amount.

The judgment of the Appellate Division is affirmed in part and reversed in part.

STEIN, J., concurring in part and dissenting in part.

I join in the Court's opinion to the extent that it allows Morris County (County) to recover all underpayments due to it from the

State from and after January 9, 1992, pursuant to its 1983 agreement with the Department of Corrections (Contract). I disagree with the Court's summary disposition that precludes the County from recovering underpayments prior to that date because of its alleged failure to comply with the notice and suit filing requirements imposed by the provisions of the Contractual Liability Act. *N.J.S.A.* 59:13–1 to –10. Fairly read, this record mandates a remand for an evidentiary hearing to permit a trial court to determine whether the State acted in good faith in failing to honor the contract terms for such an extended period, and whether the County, through the exercise of reasonable diligence, could have discovered earlier the fact and the extent of the State's noncompliance with the Contract's reimbursement provisions.

I

The controlling legal principles are best articulated in *W.V. Pangborne & Co. v. New Jersey Department of Transportation*, 116 *N.J.* 543, 562 *A.2d* 222 (1989). There, as here, a State agency asserted the claim limitations provision of the Contractual Liability Act (Act) to bar a claim by a contractor that, at the State's invitation, had pursued an administrative disposition of its claim. The applicable provision of the Act required that suit be instituted within one year after completion of the contract, *N.J.S.A.* 59:13–5b, which we interpreted to mean acceptance by the Department of Transportation (DOT) of the contractor's work and approval of final payment. Indisputably, suit was not commenced within one year of completion of the contract, and we rejected the contractor's contention that the work was not "complete" until completion of the administrative review of the contractor's claim. *Id.* at 552–53, 562 *A.2d* 222. We also rejected the contractor's contention that the State was equitably estopped from asserting the statute of limitations defense. *Id.* at 554–57, 562 *A.2d* 222. Nevertheless, we noted that that conclusion "does not relieve the State in these circumstances of the obligation to deal forthrightly and fairly with its contractor." *Id.* at 557, 562 *A.2d* 222. The Court accordingly

considered whether DOT impliedly was obligated to "withhold a statute of limitations defense while its contractor cooperated in submitting a disputed claim to administrative review that DOT itself encouraged and subsequently controlled." *Id.* at 560, 562 *A.*2d 222.

Concluding that DOT could not be permitted to assert the statute of limitations defense, Justice Handler, writing for a unanimous Court, observed:

> We do not think obligations or entitlements under public contracts should become the matter of either cunning or guess-work.
>
> . . . .
>
> Moreover, we have insisted that in the exercise of statutory responsibilities, government must "turn square corners" rather than exploit litigational or bargaining advantages that might otherwise be available to private citizens. *F.M.C. Stores Co. v. Borough of Morris Plains,* 100 *N.J.* 418, 426, 495 *A.*2d 1313 (1985). "[The government's] primary obligation is to comport itself with compunction and integrity, and in doing so government may have to forego the freedom of action that private citizens may employ in dealing with one another." *Id.* at 427, 495 *A.*2d 1313. We have similarly insisted that government adhere to strict standards in its contractual dealings. *P.T. & L. Constr. Co. v. Department of Transp.,* 108 *N.J.* 539, 531 *A.*2d 1330 (1987); *Keyes Martin & Co. v. Director, Div. of Purchase,* 99 *N.J.* 244, 491 *A.*2d 1236 (1985); *L. Pucillo & Sons, Inc. v. Mayor and Council of New Milford,* 73 *N.J.* 349, 375 *A.*2d 602 (1977). Therefore, DOT's failure to act with greater clarity regarding the statute of limitations, its successful encouragement of an administrative proceeding that redounded to its advantage in terms of added investigation, complete discovery, fuller preparation in defense of the contractor's claim, as well as delay in payment, and its subsequent attempt to seek a litigational advantage based on Pangborne's inadvertence or false impression constituted conduct that seems inconsistent with the notion that government must act fairly and "with compunction and integrity." *F.M.C. Stores, supra,* 100 *N.J.* at 427, 495 *A.*2d 1313.
>
> [116 *N.J.* at 560–62, 562 *A.*2d 222.]

## II

Several aspects of this record suggest strongly the appropriateness of an evidentiary hearing to determine whether the State's assertion of the statute of limitations defense is consistent with the high standards to which governmental agencies are held in their contractual relationships. To begin with, it bears noting that the County Correctional Policy Act of 1982, *N.J.S.A.* 30:8–16.3 to

–16.12, pursuant to which the Contract between the County and the Department of Corrections (DOC) was entered into, was adopted to assist the State in addressing a prison overcrowding emergency. See Office of the Governor, *Prison Overcrowding: A Plan of Action* 13–14 (1982) (Prison Overcrowding). The Governor's Prison Overcrowding plan verifies that the provision of State financial grants to counties that renovated and improved county correctional facilities and agreed to house State prisoners was part of a comprehensive effort by the executive and legislative branches of state government to confront and resolve a severe overcrowding crisis in State correctional facilities. A reasonable inference in that context is that the State's offer of a *per diem* reimbursement rate to counties that was linked to the State's cost of operating three of its largest prisons was intended as an incentive to counties to participate in the State's grant program. The record does not inform us of the total number of counties that participated in the State's grant program. Nevertheless, given that the grant program's purpose was to assist the State in alleviating its prison overcrowding crisis, there is some irony in the Assistant Attorney General's concession at oral argument that the Counties of Gloucester, Hudson and Middlesex, in addition to Morris, also have found it necessary to sue the State to collect underpayments in the amount of reimbursement due under their respective contracts.

Moreover, the Court is far too generous to the State in its willingness to impose responsibility on the County for failing to discover the correct rate of reimbursement at an earlier date. The Court states:

> The present situation involves a contract with clear and explicit payment provisions. The actual payments due under the contract were readily discoverable through public information and calculation. Not only could the County have discovered the lack of adherence to the contractual reimbursement rate through the exercise of reasonable diligence, but the County probably had actual knowledge that there existed a difference in payment as early as 1989, the time at which the Commissioner stated, that the cost to house a State prisoner in Trenton was $63.

[*Ante* at 110–11, 707 *A.2d* at 973.]

The Court's reference to the Commissioner of Correction's 1989 statement concerning the actual reimbursement rate was based on Commissioner Fauver's October 23, 1989 testimony under oath in United States District Court Civil Action No. 82–1946 entitled *Camden County Jail Inmates v. Parker*, that the average cost to house a State prisoner was approximately $63.00 per day. The Court infers that that testimony, assuming it was known to the County, clearly indicated that the State was underpaying the agreed reimbursement rate.

However, this record also reveals that in the course of appellate litigation concerning the adequacy of the State's reimbursement rate to counties concerning Executive Order prisoners housed in county jails, see *County of Gloucester v. State*, 256 *N.J.Super.* 143, 606 *A.*2d 843 (App.Div.1992), *aff'd as mod.*, 132 *N.J.* 141, 623 *A.*2d 763 (1993), Commissioner Fauver wrote to the Appellate Division Presiding Judge on May 31, 1991, and qualified his federal court testimony about the prevailing reimbursement rate:

> In the documents that have now been included to supplement the record, I stated that a fair indication of the cost of housing a state prisoner is approximately $63. *See* transcript in *Camden County Jail Inmates v. Parker* at 196, lines 6–17. This figure includes the costs for treatment, education and care programs which are provided at the state level which are not, in many instances, being provided at the county level. When adjustments are made for these services, the average cost of housing a state prisoner is approximately $50 per day.

Commissioner Fauver's letter to the Appellate Division in *Gloucester* demonstrates that any county's reliance on the Commissioner's 1989 federal court testimony would not have resulted in a reliable and incontestable contract reimbursement rate. Moreover, at oral argument before us, counsel for *amicus* Middlesex County asserted that the State acted in bad faith in refusing to respond to Middlesex County's requests to ascertain the correct contract reimbursement rate. The Middlesex County correspondence appears in the State's Appendix to its Petition for Certification and includes a copy of Commissioner Fauver's letter of July 7, 1992, to the Warden of the Middlesex County jail in which the Commissioner declines to provide information about budgeted daily costs of housing state prisoners, from which the County's

reimbursement rate could be calculated, on the ground that that issue is being litigated in the case of *Gloucester v. New Jersey.* The Commissioner's letter to Warden Johnson states:

Dear Warden Johnson:

This will respond to your correspondence of April 13, 1992 and June 25, 1992 wherein you have requested both information concerning budgeted daily costs of housing state prisoners at certain facilities, as well as increased per diem payments for state inmates housed in your facility.

The Department of Corrections is unable to comply with either of your requests at this time. The issue is currently under litigation in *Gloucester v. New Jersey, et al.* and as such I am not able to provide budget figures. Further, there are no legislatively appropriated funds to pay for any increased per diem.

Very truly yours,
William H. Fauver
Commissioner

Two subsequent letters, dated July 27 and October 2, 1992, to Commissioner Fauver from the Middlesex County counsel, noting that the *Gloucester* litigation concerned *Executive Order* reimbursement and that the Warden's letter sought information about the reimbursement rate for *contract* prisoners, apparently were not answered.

The Court's unsubstantiated assertion that "the average state housing rates were public information," *ante* at 103, 707 *A.*2d at 969, and the Attorney General's highly questionable assumption that Morris County could have "calculate[d] amounts it thought it was entitled to under the agreement" by examining the State Budget, are simply unpersuasive. This record contains more than a slight suggestion of obfuscation and non-disclosure, and an inference that the Legislature had not appropriated adequate funds to permit DOC to pay the full contract rate. The very fact that three other counties are claiming that the State also has breached its contract with them—and in the very same manner as alleged by Morris County—should be sufficient to convince the Court that a remand is warranted.

To afford the State the benefit of the statute of limitations provisions of the Contractual Liability Act is, on this record, an undeserved and unjustified windfall. The Court's disposition may

allow the State to escape a substantial and incontestible liability to at least four counties of this State who signed contracts in good faith and took for granted that the State would honor its commitments. There can be no question that the State knew the correct contract reimbursement rate. The unanswered question raised by this record is why the State did not make the payments that its contracts mandated.

### III

I would remand the matter to the Law Division for an evidentiary hearing to determine whether the State's assertion of the statute of limitations defense is consistent with the principles we articulated in *Pangborne, supra,* 116 *N.J.* at 560–63, 562 *A.*2d 222.

Justice HANDLER joins in this opinion.

*For affirmance in part; reversal in part*—Chief Justice PORITZ and Justices POLLOCK, O'HERN, GARIBALDI and COLEMAN—5.

*Concur in part; dissent in part*—Justices HANDLER and STEIN—2.